**Alfred KIRSHNER, Plaintiff-Appellant,**

**v.**

**UNITED STATES of America, Secretary of the Treasury, Commissioner of I. R. S., Alvin D. Lurie, in his capacity as Assistant Commissioner Employer Plans and Exempt Organizations, I. R. S., Bernard Golberg, Reuben Mitchell, Joseph Shannon, Robert Christen, Victor Condello, Harrison J. Goldin, James Regan, Individually and as trustees of the Teachers Retirement System of the City of New York, and Isaiah Robinson, Defendants-Appellees.**

**No. 315, Docket 77–6104.**

United States Court of Appeals, Second Circuit.

Argued Jan. 18, 1978.

Decided Nov. 30, 1978.

Rehearing and Rehearing En Banc Denied July 19, 1979.

Certiorari Denied May 29, 1979. See 99 S.Ct. 2821.

---

Alfred Kirshner, appellant pro se.

Kent T. Stauffer, Asst. U.S. Atty., New York City (Robert B. Fiske, Jr., U.S. Atty., S.D.N.Y., Patrick H. Barth, Asst. U.S. Atty., New York City, of counsel), for appellees U.S., Secretary of the Treasury, Com'r of I.R.S., and Alvin D. Lurie.

Leonard Koerner, New York City (W. Bernard Richland, Corp. Counsel, City of New York, James G. Greilsheimer, L. Kevin Sheridan and Judith A. Levitt, New York City, of counsel), for appellees, Trustees of Teachers Retirement System.

Before MOORE, SMITH and MANSFIELD, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

This is an appeal from a judgment dismissing an action brought by a beneficiary of a municipal pension fund against the trustees of the fund and others alleging deprivation of constitutionally protected rights, violations of the federal securities laws, and breach of fiduciary duty under state law, and seeking injunctive, declaratory and other relief. The United States District Court for the Southern District of New York, Lawrence W. Pierce, *Judge*, held that appellant lacked standing to sue under the federal securities laws, and dismissed the complaint in its entirety, entering judgment accordingly. We find that appellant has standing to sue under the federal securities laws, and reverse the dismissal as to the individuals sued as fund trustees.

For the purpose of this appeal from a judgment granting a motion to dismiss, we treat allegations of the complaint as admitted. *Drachman v. Harvey*, 453 F.2d 722, 724 (2d Cir. 1972); *Murray v. City of Milford*, 380 F.2d 468, 470 (2d Cir. 1967).

## I.

The facts alleged may be summarized as follows.

Appellant, Alfred Kirshner, was employed as a high school science teacher by the Board of Education of the City of New York from 1928 to 1953. During these years he was obliged to contribute to the Teachers Retirement System of the City of New York ("the System") by means of compulsory payroll deductions credited to the System's annuity savings fund. The City of New York ("the City") was required to pay into the System's contingent reserve fund amounts sufficient to provide for a pension reserve at the time of his retirement. At Kirshner's retirement in 1953, accumulated deductions were transferred on the books of the System to the System's annuity reserve fund and an amount equal to the employee's pension reserve was transferred to the System's pension reserve fund number one. Since then he has received monthly retirement allowances consisting of an annuity and a pension. In 1976 his retirement allowances totaled $3,035.68.

The System is controlled by the Teachers Retirement Board ("the Board"). The Board has the power to purchase securities for and to sell securities held by any of the System's funds. The Board's seven members are trustees for the fund. Three are elected by active employees of the Board of Education. The concurrence of at least one of these three is necessary for any decision of the Board. Retired employees have no representative on the Board.

As of June 30, 1974, about a year before the beginning of the City's financial crisis, the System had $1.85 billion in assets and $4.62 billion in accrued liabilities. Apparently, amounts paid in by the City had not been enough to establish adequate pension reserves. Of the $1.85 billion in assets, $1.62 billion had been transferred into the annuity reserve fund or the pension reserve fund number one or successor funds. The remaining $0.23 billion was held in the annuity savings fund and the contingent reserve fund or their successor funds. Of the $4.62 billion in accrued liabilities, $1.62 billion was owed to reserves for retired employees and $3 billion was owed to reserves for active employees. Thus, there was only $0.23 billion set aside for pensions of active employees although the System had outstanding retirement obligations to these employees of $3 billion. Consequently, when the City's crisis began, the principal concern of retired employees was protecting the integrity of the System's annuity reserve fund and pension reserve fund, or successor funds, while the interests of the Board of Education's active employees lay in assuring that the city had funds to put into the System, so that the employees' retirement allowances could be paid when they became due, and in seeing to it that the City was able to pay their salaries.

In June, 1975 the Legislature of the State of New York instituted the first of several steps in response to the City's financial plight. It established the Municipal Assistance Corporation for the City of New York ("MAC") "to assist the city of New York in providing essential services to its inhabit-

ants . . . and in creating investor confidence in the soundness of the obligations of such city . . . ." 1975 N.Y. Laws, ch. 169 § 3031. MAC was authorized to issue up to $3 billion in notes and bonds. It was to purchase and accept for exchange short-term obligations of the City. On September 9, 1975, the Legislature passed the New York State Financial Emergency Act for the City of New York ("the Emergency Act") which "authorized and directed" certain purchases of MAC bonds and declared these bonds "reasonable, prudent and proper investments for . . . all trustees and other fiduciaries . . . ." 1975 N.Y. Laws, ch. 870 § 14. The System was obliged to purchase bonds in the principal amount of $250 million. On September 29, 1975, however, the Court of Appeals of the State of New York struck down that portion of the Emergency Act which "directed" pension fund trustees to invest in MAC bonds as violative of the constitution of the state. Nevertheless, on October 17, 1975, to enable the City to avoid default, the Board agreed to acquire MAC bonds in the principal amount of $150 million. Concurrence of Board members elected by active employees followed concessions to active employees in contract negotiations between the City and representatives of the active employees. Still the crisis deepened. On November 15, 1975, the City defaulted on its maturing short-term obligations and declared a moratorium on all payments. Between August 21, 1975 and November 20, 1975, the Board purchased MAC bonds in the principal amount of $275 million for the System's funds.

On November 25, 1975 MAC, several commercial banks, and five City pension systems entered into an agreement ("the Agreement") pursuant to which the Board agreed to acquire City serial bonds in the principal amount of at least $860 million over a period of about 30 months. In addition on February 1, 1976 the Board agreed to exchange the MAC bonds held by the System for long-term MAC bonds bearing 6% interest per year.

The banks, according to the complaint, "while ostensibly acting as disinterested parties, while using their reputations for fiscal integrity and sound business judgment to induce the 'TRUSTEES' to purchase $860 million of NYC serial bonds, failed to make full disclosure of the fact that they had sold over $2 billion of their NYC short term notes in the previous year." The banks "fail[ed] to disclose the extent and dollar value of the City bonds held by them as assets and as trustee and fiduciary for clients, [thereby] concealing material facts that would affect an informed investment decision." It is further alleged that the members of the Board, when entering into the Agreement, "were well aware that buying NYC bonds at that time was wrongful because the City was insolvent. In April 1975 Standard & Poor had completely suspended rating NYC bonds. Moody's had downrated them to unsatisfactory Caa on November 3, 1975. . . . Not one bank, insurance company, investment company, trade union fund or corporation in the USA would at that time advance NYC any funds, but the 'TRUSTEES' volunteered to advance $860 million of the assets of the plaintiff . . . ." Moreover, the Board "accepted the reduced 6% rate on Moody-rated B (unsatisfactory) MAC bonds at a time when A's were selling with 8% to 9% returns at par."

The Agreement provided that the System's purchase of City bonds was contingent upon either the issuance of a ruling by the Internal Revenue Service ("IRS") or the enactment of federal legislation providing that the proposed purchases shall not constitute "prohibited transactions" within the meaning of § 503(b) of the Internal Revenue Code of 1954, as amended ("the Code"), or otherwise adversely affect the tax status of the System's pension funds under § 401(a) of the Code.

On December 4, 1975, the Board requested the IRS to rule that certain purchases of City serial bonds would not result in "prohibited transactions" or violate any provisions of § 401(a). However, it is alleged that "in their requests to IRS for approval [the Board] did not make full disclosure in five instances which indicate violations of

Security Exchange laws and regulations 10(b) and Rule 10b–5." It did not disclose (1) that the banks had sold City obligations in the previous year; (2) that City serial bonds were to be purchased at par when available at a discount; (3) the purchases would increase fund holdings of City obligations "to 32%"; (4) the Board intended to sell sound corporate bonds to raise cash to make these purchases; (5) the purchases were not for the exclusive benefit of the beneficiaries.

Alvin D. Lurie, an Assistant Commissioner of the IRS, issued the requested rulings. Shortly thereafter, the Board allegedly sold "sound, liquid, varied, highly-rated corporate bonds" to buy "highly speculative, poorly rated, illiquid, high risk NY City obligations," and purchased "at par $182 million NYC serial bonds which were available at discounts [of approximately 20%]." These purchases "increased the [pension funds'] holdings of NYC obligations as of December 15, 1975 to 32%."

On February 1, 1976, pursuant to the Agreement, the System exchanged MAC bonds in the principal amount of $215 million for a like amount of long-term MAC bonds bearing interest at 6% per year. The bonds which it gave up were short-term obligations bearing interest at 11% per year.

In February, 1976 hearings were held on special federal legislation which would provide that parties to the Agreement would not be considered to violate § 401(a) or § 503(b) of the Code as a result of purchases or acquisition of MAC or City serial bonds. On March 19, 1976 Congress enacted Public Law 94–236 which granted such protection of all parties for all such purchases or acquisitions made on or after August 20, 1975.

By December 31, 1976 the Board had "increas[ed] the [funds'] holding[s] of NYC obligations to $782 million or 36% of total assets." The Board voted to acquire these bonds "[i]n order to maintain . . . contract benefits, full employment at high wages and high city pension contributions to benefit the presently employed teachers . . . .." As a result of the Board's actions, the assets of the pension funds have

been "leached and dissipated." The "funds are being used to pay off NYC bonds owned by the Clearing House Banks and their clients at the expense of the minority pensioners, including plaintiff."

Under the Agreement, the Board was obliged to purchase additional City serial bonds in the principal amount of $504 million by June 30, 1978, "making 51% of [the System's] assets NYC obligations . . . .."

## II.

In February, 1977, Kirshner *pro se* commenced the instant action against the United States of America, the Secretary of the Treasury, the Commissioner of the Internal Revenue Service, Alvin D. Lurie in his capacity as Assistant Commissioner of the Internal Revenue Service, and named members of the Board, individually and as trustee of the System's funds.

In his complaint, in addition to the facts alleged above, Kirshner claims that "the 'TRUSTEES' intent to manipulate and deceive was expressly indicated by the 'AGREEMENT.'"

He maintains that "[t]he 'AGREEMENT' was tainted by fraud by 'concealing material facts to which importance could be attached that would affect informed investment decision,'" and states that the Agreement "was not made at arms length." The conduct of the members of the Board, Kirshner contends, violates § 17(a) of the Securities Act of 1933 ("the 1933 Act"), 15 U.S.C. § 77q, § 10(b) of the Securities Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, and constitutes a breach of fiduciary duty under state law. In addition, Kirshner alleges that federal and state appellees have deprived him and other retired employees of constitutional rights granted by article I, § 10 and by the fifth and fourteenth amendments to the Constitution of the United States, and that Public Law 94–236 is unconstitutional.

As relief Kirshner seeks a declaration that Public Law 94–236 is unconstitutional

and an injunction preventing its application, an order setting aside the alleged IRS rulings, an order prohibiting the Board members from purchasing additional City obligations, another order requiring them to exchange the MAC bonds bearing 6% interest for those purchased initially, and, finally, restitution for all losses incurred as a result of entering into and carrying out the terms of the Agreement.

Appellees moved separately to dismiss Kirshner's complaint for lack of jurisdiction over the subject matter and for failure to state a claim upon which relief can be granted. Kirshner cross-moved for a preliminary injunction. The district court, holding that Kirshner lacked standing to sue under the federal securities laws, granted the motions to dismiss and denied the cross-motion as moot. Kirshner appealed from the district court's order and we assumed jurisdiction.[1]

### III.

■ We agree with the district court that no basis is stated for the action against the United States and the federal officials. That claim is based on Public Law 94–236 and on the IRS ruling that the contemplated transactions would not constitute "prohibited transactions" which would deprive the securities of their tax-exempt status under the federal statutes. We fail to see in the claim any harm to the plaintiff or the funds, or any basis for the plaintiff's standing to challenge the ruling.

■ Kirshner makes a constitutional claim of impairment of the obligation of contract. But while his pension rights arise from a contract,[2] his claims of impairment must fail. Article I, § 10 of the Constitution of the United States declares that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts

. . . ." This prohibition, however, "is not an absolute one and is not to be read with literal exactness like a mathematical formula." *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 428, 54 S.Ct. 231, 236, 78 L.Ed. 413 (1934). A state may take necessary measures in pursuit of legitimate state goals without bar by the contract clause even though some contract rights may to some degree be modified or affected. *City of El Paso v. Simmons*, 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed.2d 446 (1965); *Home Building & Loan Ass'n v. Blaisdell, supra*, 290 U.S. at 398, 54 S.Ct. 231; *Koch v. Yunich*, 533 F.2d 80, 86 (2d Cir. 1976). The protection of the fiscal integrity of the City of New York is such a legitimate state goal. The Board's members are authorized by state law to invest in both MAC and City serial bonds. Administrative Code of the City of New York, ch. 20 § B20.31.0; N.Y. Public Authorities Law § 3018 (McKinney Supp.1970–77); N.Y. Banking Law § 235(4) (McKinney 1971); *Tron v. Condello*, 427 F.Supp. 1175, 1187–88 (S.D.N.Y.1976). These state laws appear to be necessary to a valid state purpose—protecting the fiscal integrity of the City by broadening the available markets for its securities—and therefore not in contravention of article I, § 10 of the Constitution.

■ Kirshner's constitutional claim of deprivation of property without due process also affords him no relief. The federal and state enactments pursuant to which the challenged actions were carried out are rationally related to lawful governmental objectives and are not unreasonable, arbitrary or capricious. Assuming, *arguendo*, that Kirshner has constitutionally protected property right, see *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Tron v. Condello, supra*, 427 F.Supp. at 1189; *Robbins v. Police Pension Fund*, 321 F.Supp. 93, 97 (S.D.N.Y.

1. The judgment entered below dismissed the complaint, but not the action. Appellees have not raised this issue on appeal. However, under 28 U.S.C. § 1292, jurisdiction may be predicated upon the district court's denial of appellant's cross-motion for a preliminary injunction.

2. The Constitution of the State of New York, article V, § 7 provides that after May 1, 1940, membership in any pension or retirement system of a civil division of the state "shall be a contractual relationship, the benefits of which shall not be diminished or impaired."

1970), he cannot be said to have been deprived of that right without substantive or procedural due process. See generally *Nebia v. New York*, 291 U.S. 502, 525, 54 S.Ct. 505, 78 L.Ed. 940 (1934); *Koch v. Yunich, supra*, 533 F.2d at 84. Nor has Kirshner been denied equal protection of the laws by either the federal or state enactments, for he has not demonstrated any arbitrary or unreasonable classification in the statutes. See *Reed v. Reed*, 404 U.S. 71, 76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).

Kirshner's claim that Public Law 94–236 and the IRS rulings violate the fifth and fourteenth amendments is likewise without merit. Their effect is solely to remove any question as to the tax exempt status of the securities involved and could only benefit, rather than damage, the City and its creditors. The district court was correct in dismissing appellant's constitutional claims.

The situation is different, however, as to the Securities Acts claims against the nonfederal defendants. We are concerned at this point only with whether Kirshner has alleged facts sufficient to give him standing to sue under the securities laws and to form a basis for relief if liability is established on trial. We, of course, intimate no opinion as to the truth of his allegations. The court below, citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), held that Kirshner lacks standing to assert a private cause of action under § 10(b) of the 1934 Act, 15 U.S.C. § 78j(b) [3] and Rule 10b–5, 17 C.F.R. § 240.-10b–5,[4] promulgated thereunder. We disagree. To be sure, in *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), affirming dismissal of a derivative action against a director for violation of § 10(b) where the director had sold his shares in the corporation to an outside purchaser, we stated that § 10(b) and Rule 10b–5 "extended protection only to the defrauded purchaser or seller," *id.* at 464.

Since its promulgation in 1952, the *Birnbaum* rule has been adhered to consistently in this circuit; see *International Controls Corp. v. Vesco*, 490 F.2d 1334, 1346 n. 16 (2nd Cir.), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974). We have, however, recognized that a shareholder who has not purchased or sold shares may bring a derivative action under § 10(b) against corporate insiders on behalf of the defrauded corporation if the corporation has bought or sold securities. *Schoenbaum v. Firstbrook*, 405 F.2d 215, 219 (2d Cir. 1968), *cert. denied sub nom. Manley v. Schoenbaum*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); *Ruckle v. Roto American Corp.*, 339 F.2d 24, 27–28 (2d Cir. 1964). And in approving the *Birnbaum* rule in *Blue Chip Stamps v. Manor Drug Stores, supra*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539, the Court took cognizance of this interpretation of the rule, *id.*, at 748–49.

We think the beneficiary of a pension trust, like the shareholder in a derivative suit, has standing to attack securities frauds perpetrated or threatened by the trustees of his fund. A number of courts have taken the view that a trust beneficiary may sue under Rule 10b–5. See, *e. g.*,

---

3. Section 10(b) of the 1934 Act makes it
   unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

4. Rule 10b–5 reads:
   Employment of manipulative and deceptive devices.
   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
   (1) To employ any device, scheme or artifice to defraud,
   (2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
   (3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

*James v. Gerber Products Co.*, 483 F.2d 944 (6th Cir. 1973); *Heyman v. Heyman*, 356 F.Supp. 958 (S.D.N.Y.1973). Treating the allegations of the *pro se* complaint liberally as we must under *Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), it would appear that purchase and sale of securities is sufficiently involved, see *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), and that the plaintiff has also alleged the knowledge and intent to defraud required by *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).[5]

■ The court below also held that Kirshner has no claims under § 17(a) of the 1933 Act, 15 U.S.C. § 77q, because no private cause of action is recognized under this section. We disagree with this conclusion. See *Daniel v. International Bhd. of Teamsters*, 561 F.2d 1223, 1244–46 (7th Cir. 1977), *cert. granted* 434 U. S. 1061, 98 S.Ct. 1232, 55 L.Ed.2d 761 (1978) *cert. granted*, (1978).[6] We left the question open in *Globus v. Law Research Service, Inc.*, 418 F.2d 1276, 1283–84 (2d Cir. 1969), *cert. denied*, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970), noting, however, Judge Friendly's remark concurring in *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 867 (2d Cir. 1968), that there was little practical point in denying the existence of an action under § 17 once it is established that an aggrieved buyer has a private action under § 10(b) of the 1934 Act.

We agree with the Seventh Circuit that the language of § 17 is broad enough to imply a private right of action and that the beneficiaries of the trust are persons claiming injury for the alleged fraud in purchase and sale of securities.

Kirshner has standing, as a beneficiary of the fund, to bring this action on behalf of the fund against those alleged to have defrauded the fund in its purchase of securities, and the complaint may be interpreted to charge participation by these defendants in fraudulent sale of securities by and to the fund.

The district court dismissed Kirshner's state law claims for breach of fiduciary duty. Since Kirshner states a claim under § 10(b) and § 17, on remand he may assert his pendent state claims. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Of course, as we have said, we intimate no opinion as to the merits of any of the claims.

Judgment reversed. Dismissal of Rule 10b–5 and § 17 claims and pendent state law claims reversed. Dismissal of other claims affirmed. Case remanded for proceedings not inconsistent with this opinion.

MOORE, Circuit Judge (dissenting):

I would affirm, largely for the reasons set forth in Judge Pierce's well-reasoned opinion.

---

**5.** The dissent evidences concern that the provisions of the Employee Retirement Security Act of 1974 (ERISA), particularly requirements concerning disclosure, preclude a cause of action under the Securities Acts in this case. We believe that this concern is misplaced. First, it is not at all clear that the specific requirements of ERISA preclude actions under the broader requirements of the Securities Acts. See *Daniel v. International Bhd. of Teamsters*, 561 F.2d 1223, 1248 (7th Cir. 1977), *cert. granted*, 434 U.S. 1061, 98 S.Ct. 1232, 55 L.Ed.2d 761 (1978). (ERISA should be read as "complementary" to the anti-fraud provisions of the Securities Acts.) Second, the cause of action here does not stem from a specific duty to disclose on the part of the trustees. In addition to a general duty of disclosure, *James v. Gerber Products Co.*, 483 F.2d 944 (6th Cir. 1973), plaintiff's complaint, read liberally, alleges a conspiracy

to defraud in violation of Rule 10b–5, which is in no way tied to a specific duty of disclosure. See *Ferguson v. OmniMedia*, 469 F.2d 194 (1st Cir. 1972); *Herpich v. Wilder*, 430 F.2d 818 (5th Cir. 1970), *cert. denied*, 401 U.S. 947, 91 S.Ct. 935, 28 L.Ed.2d 230 (1971).

**6.** See also, *Newman v. Prior*, 518 F.2d 97 (4th Cir. 1975); *Surowitz v. Hilton Hotels Corp.*, 342 F.2d 596 (7th Cir. 1965); *Wulc v. Gulf & Western Ind.*, 400 F.Supp. 99 (E.D.Pa.1975); *contra*, *Shull v. Dain, Kalman & Quail, Inc.*, 561 F.2d 152 (8th Cir. 1977); *Scarfarotti v. Bache & Co.*, 438 F.Supp. 199 (S.D.N.Y.1977); *Gunter v. Hutcheson*, 433 F.Supp. 42 (N.D.Ga.1977); *Architectural League of New York v. Bartos*, 404 F.Supp. 304 (S.D.N.Y.1975); *Welch Foods v. Goldman Sachs*, 398 F.Supp. 1393 (S.D.N.Y. 1974).

Plaintiff is the recipient of a pension from the New York City Teachers' Retirement System. He retired in 1953 and since then has been on a pension—$3,000 a year. There is no allegation that any of the acts complained of have caused his pension to cease or payments to have been diminished. Indeed, paragraph 9b of his complaint reveals that he is unable to allege any injury to his interests because his retirement account was fully funded at the time of his retirement and apparently has remained fully funded up to this day. Furthermore, his actuarial calculations show that his expectant lifetime pension is $39,000; the $1.6 billion in the Funded Assets Account of the Retirement System amounts to $64,600 for each retiree, more than enough to fund his expected pension. Hence, Kirshner has not been injured by the acts complained of. *See Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

Not only has Kirshner failed to allege facts to support his standing to sue, but also, as appears from Judge Pierce's opinion, he has failed to state a cause of action on his nonsecurities law claims. The gravamen of his complaint is that certain investments in New York City bonds made recently, at a time when the City was in dire financial straits, were improvident. In view of the prominence given to the City's financial plight in the public press, I am willing to take judicial notice that investment in its securities would be highly questionable. However, in addition to the many burdens placed upon the judiciary, I am unwilling to add that of investment counsel to an employees pension fund to the list. Support for this position is found in a decision of New York's highest court in *Sgaglione v. Levitt,* 37 N.Y.2d 507, 375 N.Y. S.2d 79, 337 N.E.2d 592 (1975) and in Judge Conner's decision in *Tron v. Condello,* 427

F.Supp. 1175 (S.D.N.Y.1976). Whatever relief, if any, to which plaintiff may be entitled may be had through the state courts where breach of fiduciary duty may be asserted and equitable relief and damages, if any, awarded.[1]

The majority opinion supports most of Judge Pierce's decision and disagrees only with his treatment of Kirshner's securities law claims. Even if Kirshner has standing to bring this action, as the majority finds he does, his complaint should still be dismissed for failure to state a cause of action under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and § 17 of the Securities Act of 1933, 15 U.S.C. § 77q. In my opinion, the majority's holding that the complaint states a cause of action under § 10(b) and § 17 constitutes an ill-advised extension of the reach of the antifraud provisions of the securities laws as they have been applied to allegations of corporate mismanagement.[2]

There has been a tendency over recent years to rely upon various sections of the Securities Exchange laws to create causes of action by the recital of section numbers such as § 10(b), Rule 10–b(5) and § 17, as if the mere recital had a talismanic effect and would bring some kind of a triable action into being.

The private cause of action under § 10(b) was created by federal courts in order to effectuate congressional policies arguably embodied in the securities legislation passed in 1933 and 1934. Thus the broad extension of the private § 10(b) action has not been mandated by Congress; it is rather a matter of the courts seeking to erect a rational enforcement system on a very shaky base. However, a rational enforcement system ought to take into account the latest efforts of Congress to regulate retirement trust

---

1. The availability of a state court remedy for breaches of fiduciary duty and the traditional role of state law in regulating trust fund fiduciaries add additional support to my belief, explained later in the text, that Kirshner has failed to state a cause of action under § 10(b). *See Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 478, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

2. *See Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 475 n.15, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) and the cases cited therein; Jacobs, *How Santa Fe Affects 10b–5's Proscriptions Against Corporate Mismanagement,* 6 Sec. Reg.L.J. 3 (1978).

fund managements. In the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1381, Congress has established detailed and complex rules to control pension fund managers. In pertinent part, ERISA provides that pension fund trustees have a duty of undivided loyalty to the beneficiaries, 29 U.S.C. § 1104, and regulates the extent to which a pension fund can hold securities issued by the employer, 29 U.S.C. §§ 1106–1107. ERISA contains complex disclosure and reporting requirements, but nowhere does it require that trustees must disclose in advance to the beneficiaries their proposed investment transactions, 29 U.S.C. §§ 1021–1026. If Congress had wanted to require pension fund trustees to disclose investment transactions, Congress would have enacted such a rule. Although this case involves a public employee pension fund, the majority's holding that a pension beneficiary has a cause of action against the trustee is equally applicable to private pension funds which are covered by ERISA. Moreover, since Congress has elected not to burden municipal employee pension funds with ERISA's requirements, 29 U.S.C. § 1003, a federal court should not create a new disclosure duty on the dubious foundation of § 10(b) and apply it to public employee pension funds in this case. I would find that Kirshner's complaint has not stated a federal cause of action upon which relief can be granted.

In short, I believe that Judge Pierce has correctly analyzed the amended complaint (and the law applicable thereto) and found it wanting. With that analysis I concur and hence would affirm.

### On Petition for Rehearing

J. JOSEPH SMITH, Circuit Judge.

The appellee-trustees have filed a petition for rehearing in light of the Supreme Court's recent decision in *International Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979). This case, however, does not involve the issues decided in *Daniel,* which held that an interest in a non-contributory, compulsory pension plan is not a security within the meaning of § 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), or § 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10). Kirshner does not claim that his pension interest under the System is a security. He contends rather that fraud was perpetrated by the trustees in connection with the fund's purchase of MAC and NYC bonds, which the trustees cannot and do not contend are not securities. Thus Kirshner merely is suing derivatively as a trust beneficiary to attack the fraud allegedly perpetrated upon the fund by the trustees in connection with the purchase of these securities. *See, Kirshner v. United States,* 603 F.2d 234, 240 (2d Cir. Nov. 30, 1978).

*Daniel* also has no effect on our conclusion that a private right of action exists under § 17(a) of the 1933 Act, 15 U.S.C. § 77q, since the Court found it unnecessary to reach that issue. 439 U.S. at 557 n. 9, 99 S.Ct. 795.

The petition for rehearing is denied.

MOORE, Circuit Judge (concurring):

On January 16, 1979 we affirmed by order Judge Conner's opinion in *Withers v. Teachers Retirement System,* 447 F.Supp. 1248 (S.D.N.Y., 1978), *aff'd by order,* 595 F.2d 1210 (2d Cir. 1979). Judge Conner considered at length all of the facts which underlie Kirshner's allegations. He found that the Teachers Retirement System Trustees had not breached their fiduciary duties to the TRS beneficiaries. It is unlikely that Kirshner will be able to prove that the Trustees have violated the securities laws.

Since Kirshner will have to establish at trial that the Trustees did breach their fiduciary duties, overcoming at least the *stare decisis* effect of *Withers,* I think that a rehearing at this time would be a waste of judicial energy.