Lamar H. OCHS, David C. Cole, Irving Mann, David S. Takvorian, David B. Haltzclau, Ben Marino, Jr., Morris R. Westlund, Dr. Phillip E.B. Byrd, Jr., Mary B. McComb, Walter E. Foster, Louis G. Cian, F.W. Albers, James H. Williams, Jr., Edward R. Norford, Michael J. & Kathleen R. Reidy, Douglas C. Paul, Ollie & G.F. McNamara, Richard Schneider, Guy D. & Irene F. Strevey, Joan M. Thistlewood, Glenn Schrobilgen, Lynn, Lisa & Anne Torray, Jtwros, Betty Kisn, Eberhard C. Von Clemm, Marc H. Glickman, M.D., Surendrapal Singh Mac, Jane A. Miller, J.J. Kasper, Thomas E. Jones, Thomas H. Ware, Patricia Anne Morton, Edwin E. Musser, John V. Stevens, Benjamin C. & Perpetua B. Guerra, George & Chris-

tine Giannaris, Charles Railsback, Dr. Rogelio F. Arcunio, Esther & George G. Lee, M.D., Charles W. Scaling, III, Gerald C. Chichester, Stephen E. Chiarello & Patricia F. Chiarello and Michael M. Shapiro, Plaintiffs,

v.

SHEARSON LEHMAN HUTTON INC., E.F. Hutton & Company, Inc., Hutton Real Estate Services II, Inc., Continental Real Equities, CR, Butterfield Venture Corporation, Bernard W. Baker, and Gary L. Langendoen, Defendants.

No. 89 Civ. 3778 (CSH).

United States District Court, S.D. New York.

May 23, 1991.

Stephen R. Lang, Howard S. Wolfson, Brenda F. Szydlo, Breed, Abbott & Morgan, New York City, for defendant Butterfield Venture Corp.

Herbert Beigel, Bijan Amini, Lawrence R. Gelber, Beigel & Sandler, Ltd., New York City, for plaintiffs.

Gerald Kerner, Douglas Young Peters, Pamela G. Bishop, Willkie Farr & Galla-

gher, New York City, for defendants Shearson, Lehman Hutton Inc., E.F. Hutton & Co., Inc. and Hutton Real Estate Services II.

## MEMORANDUM OPINION AND ORDER

### HAIGHT, District Judge:

In this action based upon the Securities Exchange Act of 1934 and the civil RICO statute, various defendants move under Rules 9(b) and 12(b)(6), Fed.R.Civ.P., to dismiss plaintiffs' second amended complaint.

## BACKGROUND

The amended complaint alleges that plaintiffs invested as limited partners in E.F. Hutton Southwest Properties II (the "Partnership" or "Southwest"), a Delaware limited partnership formed, sponsored, promoted and operated by the defendants. Plaintiffs allege at one point in the amended complaint that they made their investments in reasonable reliance on a Private Placement Memorandum (the "Memorandum"), and supplemental sales literature accompanying the Memorandum, prepared, issued and distributed by certain defendants, although the pleading also contains inconsistent allegations. There are 44 plaintiffs. They invested amounts ranging from $7,000 to $120,000, with most investments being in the amount of $60,000.

With respect to the defendants, plaintiffs allege that Shearson Lehman Hutton, Inc. ("SLH") was at the relevant times a Delaware corporation maintaining its principal place of business in New York, New York, and the successor-in-interest to defendant E.F. Hutton & Company, Inc. ("Hutton") as the result of a merger. Hutton, a Delaware corporation with its principal place of business in this district, was at the relevant times a national brokerage firm in the business of trading, underwriting and distributing securities. Hutton acted as the promoter and sponsor of the Partnership, and additionally acted as promotor and sponsor of numerous "tax advantaged" investments.

Hutton was also a controlling person of defendant Hutton Real Estate Services, II, Inc. ("HRES II") within the meaning of the federal securities laws. HRES II, a Delaware corporation with its principal place of business in this district, was the original general partner of the Partnership.

Defendant Continental Real Equities ("ConReal") was a California general partnership, and the general partner of the Partnership.

Defendant CR, formed by defendants Bernard W. Baker and Gary Langendoen, was a California general partnership, and the general partner of ConReal. CR was a controlling person of ConReal within the meaning of the federal securities laws.

Defendant Butterfield Venture Corporation ("Butterfield") was a California corporation, and one of two general partners of ConReal, CR being the other general partner. Butterfield, the complaint alleges upon information and belief, held a 50% interest in ConReal in 1983. Defendant Baker is a California citizen and at the relevant times was a general partner of CR and a controlling person of CR, ConReal and the Partnership. Defendant Langendoen, a California citizen, was a general partner of CR, and a controlling person of CR, ConReal and the Partnership. *See* Complaint at ¶¶ 6–13.

In ¶ 14, plaintiffs allege that "[t]he tightly interconnected partnership relationships between defendants Baker, Langendoen, CR, ConReal and Butterfield, were such that knowledge or information within the ken of any of them was necessarily within the ken of each of them."

The amended complaint alleges that in 1977 and 1978, Alltex Construction, Inc., a Texas real estate development corporation, built 19 apartment complexes, many of them in Texas. The defendants are alleged to have entered into a fraudulent scheme pursuant to which limited partnerships were formed to purchase and operate some of the Alltex properties. Hutton's role was to promote and sell limited partnership interests to investors through Hutton's network of retail brokers. During the 1980's Hutton had a special division which underwrote, sponsored or sold limited partnership investments to its customers and others. This was the Tax Shelter/Direct Investment Department, headed by Bill Turchyn, Jr., a director of HRES II. Hutton is alleged to have "placed special emphasis on its ability to satisfy the investment objec-

tives of conservative investors who were primarily interest in income or low risk investments," and to have "lured investors into these investments by creating the false impression, through advertising and sales hype that the investments would be safe, profitable and suitable for conservative investors." ¶ 23. The Partnership involved in this action is one of the limited partnership investments "offered by Hutton and its affiliates and partners in this manner." ¶ 24.

Plaintiffs allege that ConReal and Hutton formed the Partnership on or about March 27, 1984. Baker and Langendoen were the initial limited partners. ConReal was the initial managing general partner and management agent. HRES II was the other general partner. ¶ 25, 26. Between January and June 1984, ConReal acquired a number of apartment complexes from Alltex. Thereafter the "defendants" caused the Partnership to acquire from ConReal six apartment complexes during the period from late March 1984 through June, 1984. These apartment complexes were named "Peppermill I," "Cross Creek," "Misty Woods," "Summertree," "Westcreek," and "Good Life." The Partnership acquired these six complexes from ConReal for $53,-287,760, a price which plaintiffs allege "was paid without the benefit of an appraisal and in excess of the market value of the properties." ¶ 30.

While the amended complaint is far from a model of clarity, plaintiffs allege in substance that they purchased units in that partnership named E.F. Hutton Southwest Properties II ("Southwest"). Southwest was alleged to have been formed, sponsored, promoted and operated by the defendants to purcahse these six apartment complexes for the purpose, in part, of generating tax advantages for the plaintiffs. The purchase price per unit of the Partnership was $60,000, $20,500 to be paid in cash at the time of purchase and the balance of $57,500 payable over five years in annual installments and subject to interest. The limited partners executed promissory notes to evidence those obligations.

¶ 4 of the complaint alleges that each of the plaintiffs invested in the Partnership "in reasonable reliance on a private placement memorandum (the "Memorandum"), and the supplemental sales literature accompanying the Memorandum ..." ¶ 46 alleges, however, that

Hutton's brokers started selling the offering on or about May 21, 1984, and the Units were placed in three days. The offering and placement thus occurred prior to the effective date of the Memorandum, dated May 30, 1984. Copies of the Memorandum were sent to the investors subsequent to the sale.

It is impossible to reconcile these allegations. If copies of the Memorandum were not sent to investors until after the sale, as alleged in § 46, plaintiffs could not have invested in reliance on its contents, as alleged in § 4. Given the procedural history of the case, discussed *infra*, I treat the allegations of ¶ 46 as controlling.

Hutton brokers are alleged to have engaged in fraudulent selling practices. ¶¶ 43–46. As for the Memorandum, it is alleged to contain a number of fraudulent misrepresentations and omissions. ¶¶ 52–68. Comparable allegations are made in respect of an inter-office memorandum and a promotional brochure which accompanied the Memorandum and were intended as supplemental sales literature. ¶ 69–82.

In addition to the particular misrepresentations and omissions alleged to be contained in the Memorandum and the sales documents, plaintiffs allege that two of the properties contained asbestos, and that defendants failed to exercise due diligence to discover its presence, which had an adverse economic impact on the sale price of the two properties involved. ¶¶ 83–85.

Plaintiffs allege fraudulent concealment by defendants of these misrepresentations and omissions, and allege that "[u]ntil shortly before the filing of the complaint, plaintiffs were unaware of the facts as described above and could not have reasonably discovered such facts until the information gathered and determinations made by plaintiffs' attorneys were first made known to plaintiffs. ¶ 87; *see also* ¶¶ 88–91.

In these circumstances, plaintiffs in their amended complaint assert the following claims for relief: first, against all defendants for violation of § 10(b) of the Securi-

ties Exchange Act of 1934; second, against all defendants for violation of § 17(a) of the Securities Act of 1933; third, against all defendants for common law fraud; fourth, against defendants Hutton, HRES II, ConReal, Baker, Langendoen and CR, for breach of fiduciary duty; fifth, against the general partners of the Partnership for breach of contract, and sixth, against all defendants under the civil RICO statute for violations of 18 U.S.C. § 1962(a), (c) and (d).

SLH, Hutton, and HRES II move to dismiss the second claim on the ground that no private right of action exists under § 17(a) of the 1933 Act, and the RICO claim for insufficient pleading, failure to state a claim, and unconstitutionality of the statute. They move to dismiss the fraud claims for failure to comply with Rule 9(b), Fed.R.Civ.P. and the claim for breach of fiduciary duty for failure to state a claim. Lastly, these defendants move to dismiss the pendent common law and breach of contract claims for lack of subject matter jurisdiction.

Defendant Butterfield moves to dismiss the complaint as to it for comparable reasons.

### DISCUSSION

*The Claims Under § 17(a) of the 1933 Act*

Plaintiffs assert claims against all defendants under § 17(a) of the 1933 Act. I dismiss those claims because that section of the statute does not create a private right of action.

In *Kirshner v. United States*, 603 F.2d 234, 241 (2d Cir.1978), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979), the Second Circuit held that a private cause of action is available under § 17(a). The Second Circuit reasoned in *Kirshner* that § 17(a) was essentially identical to § 10(b) of the 1934 Act where a private cause of action was implied. 603 F.2d at 241. However, as the Second Circuit recently recognized in *Wexner v. First Manhattan Co.*, 902 F.2d 169, 173 (2d Cir. 1990), that determination "has been severely, and perhaps fatally, undercut by the Supreme Court's ruling to the contrary in

*Aaron v. SEC*, 446 U.S. 680 [100 S.Ct. 1945, 64 L.Ed.2d 611] (1980)."

As *Wexner* goes on to observe, the reasoning of *Kirshner* has been questioned by subsequent Second Circuit opinions, *Yoder v. Orthomolecular Nutrition Institute, Inc.*, 751 F.2d 555, 559 n. 3 (3d Cir.1985); *Zerman v. Ball*, 735 F.2d 15, 23 (2d Cir. 1984); has been criticized by legal scholars; and a number of district courts have concluded, notwithstanding *Kirshner*, that no private cause of action can be implied from § 17(a). *See* district court cases collected at 902 F.2d 174. While leaving the question open, the *Wexner* court said at 174: "It is apparent that the vitality of our holding in *Kirshner* is in doubt, and the existences of a private right of action under § 17(a) is in need of reexamination."

This Court has previously held that § 17(a) confers no private cause of action. *Ackerman v. Clinical Data, Inc.*, No. 84 Civ. 5400, 1985 WL 1884 (S.D.N.Y.1985) (LEXIS, GENFED library Dist. file). The Second Circuit in *Wexner* cited *Ackerman* among the district court opinions collected at 902 F.2d 174. Given the Second Circuit's recent questioning of *Kirshner's* vitality, I see no basis for departing from the conclusions I reached in *Ackerman*.

The § 17(a) claims against all defendants will be dismissed without leave to replead.

*The RICO Claims*

Plaintiffs' amended complaint alleges that defendants violated 18 U.S.C. § 1962(a) and (c), and conspired to violate those provisions, in violation of § 1962(d).

Each of those RICO subsections requires plaintiffs to plead that defendants conducted their affairs "through a pattern of racketeering activity." *See H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 2897, 106 L.Ed.2d 195 (1989). Defendants contend that plaintiffs have not done so.

In *H.J., Inc. v. Northwestern Bell Telephone Co.*, 109 S.Ct. 2893, the Supreme Court undertook to identify and define the ingredients and boundaries of a "pattern of racketeering activity." Justice Brennan's opinion commanded only a 5–4 majority,

but it represents the Court's most recent articulation of the governing principles.

■ *H.J.* holds that a "pattern of racketeering activity" requires the combination of predicate acts related to each other and continuity of conduct. 109 S.Ct. at 2900.

As for relatedness, the *H.J.* majority derived from Title X of the Organized Crime Control Act of 1970, of which RICO formed Title IX, the rule that to be related, predicate acts must have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 2901.

■ However, the Court continued, the relatedness of racketeering activities is not sufficient to satisfy § 1962's "pattern" element. "To establish a RICO pattern it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." *Ibid.* (emphasis in original). As to continuity, the *H.J.* majority wrote:

> "Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. *See Barticheck v. Fidelity Union Bank/First National State*, 832 F.2d 36, 39 (CA3 1987). It is, in either case, centrally a temporal concept—and particularly so in the RICO context, where *what* must be continuous, RICO's predicate acts or offenses, and the *relationship* these predicates must bear one to another, are distinct requirements. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated. *See* S.Rep. No. 91–617, at 158.

*Id.* 109 S.Ct. at 2902 (emphasis in original).

The civil complaint in *H.J.* alleged that at different times over the course of at least a six-year period telephone company officers and employees gave members of a state regulatory commission bribes in order to obtain approval of unfair and unreasonable utility rates. The Court noted plaintiff's "claim that the racketeering predicates occurred with some frequency at least over a six-year period, which *may* be sufficient to satisfy the continuity requirement." *Id.* at 2906 (emphasis added). The case was remanded to the district court for further proceedings consistent with the Court's opinion.

In *Beauford v. Helmsley*, 865 F.2d 1386 (2d Cir.) (en banc), *vacated and remanded*, 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 *original decision adhered to*, 893 F.2d 1433 (2d Cir.1989), plaintiffs alleged that defendants made a number of material misrepresentations in an offering plan for the conversion of an apartment complex into condominiums. The plan was mailed to more than 800 addresses. The complaint alleged additional facts sufficient to justify an inference that defendants would in the future be making further, equally fraudulent amendments to the offering plan. The Second Circuit held these allegations sufficient to describe a pattern of racketeering activity. The en banc majority and the three dissenting judges in *Beauford* agreed that the concepts of "relatedness" and "continuity" were crucial; and, in a departure from prior Second Circuit authority, observed that "our analysis of relatedness and continuity has shifted from the enterprise element to the pattern element." 865 F.2d at 1391. That shift presaged the Supreme Court's analysis in *H.J.*, which had not yet been decided.

In *Beauford* the Second Circuit defined Congress' goal in defining "pattern of racketeering activity" as to exclude from the reach of RICO criminal acts that were

merely "isolated" or "sporadic." Consequently, Judge Kearse wrote for the en banc majority, "we must determine whether two or more acts of racketeering activity have sufficient interrelationship and whether there is sufficient continuity or threat of continuity to constitute such a pattern." *Id.* at 1391. Where the enterprise itself is associated with organized crime, that fact alone is sufficient to "tend to belie any notion that the racketeering acts were sporadic or isolated." *United States v. Indelicato,* 865 F.2d 1370, 1384 (2d Cir.1989) (en banc, decided with *Beauford*).

> When, however, there is no indication that the enterprise whose affairs are said to be conducted through racketeering acts is associated with organized crime, the nature of the enterprise does not of itself suggest that racketeering acts will continue, and proof of continuity of racketeering activity must thus be found in some factor other than the enterprise itself.

*Beauford* at 1391.

The complaint in *Beauford* was legally sufficient for these reasons:

> In sum, read with ordinary charity, the amended complaint alleged that on each of several occasions defendant had mailed fraudulent documents to thousands of persons and that there was reason to believe that similarly fraudulent mailings would be made over an additional period of years. These allegations sufficed to set forth acts that cannot be deemed, as a matter of law, isolated or sporadic.

*Id.* at 1392.

The Supreme Court granted *certiorari* in *Beauford,* vacated the Second Circuit's judgment, and remanded the case to that court for further consideration in light of *H.J.,* 109 S.Ct. 2893. The Second Circuit gave *Beauford* that mandated further consideration and adhered to its en banc decision. 893 F.2d 1433.

*See also Jacobson v. Cooper,* 882 F.2d 717, 720 (2d Cir.1989) (continuity is sufficiently alleged where related predicates extend over "a matter of years"); *Official Publications, Inc. v. Kable News Co.,* 884

F.2d 664, 666–68 (2d Cir.1989) (allegedly fraudulent acts occurred "pursuant to a longstanding contract, over a considerable period of time"; contracts in suit were dated 1974 and 1980); *Procter & Gamble v. Big Apple Industrial Buildings, Inc.,* 879 F.2d 10, 18 (2d Cir.1989) ("the complaint must provide allegations sufficient to infer that an enterprise exists, and that the acts of racketeering were neither isolated nor sporadic;" allegations sufficient which claimed "that defendants engaged in at least five separate fraudulent schemes"). In *Creative Bath Products, Inc. v. Connecticut General Life Insurance Co.,* 837 F.2d 561, 564 (2d Cir.1988), the Second Circuit followed its own precedent and anticipated *H.J.* in holding that the plaintiffs failed to allege RICO "continuity" where their case "consisted of the proposition that defendants had made three fraudulent representations in pursuit of a single short-lived goal," *i.e.,* the sale of four insurance policies on the lives of two individuals.

In the case at bar, plaintiffs' original complaint alleged that all defendants had defrauded them by misrepresentations in and omissions from Southwest's Private Placement Memorandum. Defendants move to dismiss the securities fraud claims on the ground that they did not comply with the particularity requirements of Rule 9(b). Plaintiffs did not oppose that motion. Instead, they filed the amended complaint which is the subject of the present motions to dismiss. The amended complaint abandons the theory that plaintiffs' investments were induced by the Memorandum. Plaintiff now allege at ¶ 46:

> Hutton's brokers started selling the offering on or about May 21, 1984, and the Units were placed in three days. The offering and placement thus occurred prior to the effective date of the Memorandum, dated May 30, 1984. Copies of the Memorandum were sent to the investors subsequent to the sale.

These allegations have consequences in the context of plaintiffs' § 10(b) claim, discussed *infra.* However, they are also relevant to RICO continuity analysis. What the amended complaint alleges is the for-

mation of the Partnership in March 1984, initial selling efforts on May 21, 1984, and the placement of all Units of the Partnership only three days thereafter.

Plaintiffs do not allege closed-end continuity sufficient to satisfy the RICO statute as interpreted by the Supreme Court in *H.J.*

Closed-end continuity is not established by even a substantial number of predicate acts, if those acts all take place within a brief period of time. That is because "continuity", of either the closed-end or open-ended variety, is "centrally a temporal concept," *H.J.*, 109 S.Ct. at 2902. A number of similar acts may establish relatedness for RICO purposes, but relatedness and continuity are "distinct requirements," and related predicate acts do not satisfy the continuity requirement unless they extend "over a substantial period of time." *Ibid.* That cannot be said of the predicate acts alleged in the amended complaint.

The amended complaint is equally deficient in allegations of open-ended continuity. No threat of continuity in respect of the Southwest Partnership is demonstrated by the pleading; the Partnership is alleged to have been fully subscribed, and there is no allegation that it is seeking new subscribers.

The case at bar may therefore be contrasted with *Beauford v. Helmsley, supra,* which dealt with the mailings of allegedly fraudulent materials relating to the sale of condominium apartments. The complaint alleged that "some 40%" of the apartments in question remained unsold, and "that there was reason to believe that similarly fraudulent mailings would be made over an additional period of years. 865 F.2d at 1292.

There being no allegation of open-ended continuity in respect of the particular venture giving rise to plaintiffs' claims, they cast a wider net and allege in the amended complaint at ¶¶ 141–142 that defendants, having "represented that they are engaged in the business of investments ... and managing real estate and real estate related investments ... will continue to offer limited partnership investments to inves-

tors throughout the United States," so that "there is a threat of continuing racketeering activity within the meaning of RICO."

The most that can be said for this aspect of the pleading is that it alleges the defendants, corporate and individual, are continuing to do business. If the corporate and individual defendants were associated with organized crime, those allegations would be sufficient to plead open-ended continuity under *United States v. Indelicato, supra.* But defendants may not be so characterized; and plaintiffs' concept of a "threat of continuing racketeering activity" on the part of these defendants is far too conjectural to satisfy the requirements of RICO pleading. Something more concrete, as in *Beauford v. Helmsley,* is required. The threat of continued activity of the sort of conduct alleged in the amended complaint is particularly unlikely, given the fact, which I can judicially notice, that the Tax Reform Act of 1986 came close to eliminating the deductibility of losses claimed by participants in tax shelter investments such as this Partnership.

I conclude that these plaintiffs do not and cannot allege a viable RICO claim. Accordingly I will dismiss the sixth claim for relief without leave to replead. In the view I take of the case I need not reach the other issues concerning RICO addressed by the briefs, including the constitutionality of the statute.

### The § 10(b) Claims

The moving defendants challenge the sufficiency of plaintiffs' allegations of fraud. They rely in large measure upon Rule 9(b) Fed.R.Civ.P.

Before analyzing the amended complaint, it is useful to review pertinent Second Circuit authority.

Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Rule 9(b) must be read together with Rule 8(a) which requires "only a 'short and plain statement' of the claims for relief." *Ouak-*

nine v. MacFarlane, 897 F.2d 75, 79 (2d Cir.1990); DiVittorio v. Equidyne Extractive Industries, Inc., 822 F.2d 1242, 1247 (2d Cir.1987). On a motion to dismiss, the court assumes the truth of plaintiff's factual allegations, Ouaknine at 78, reads the complaint generously, and draws all inferences in favor of the pleader. Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir.1989); Yoder v. Orthomolecular Nutrition Institute, Inc., supra at 562. But Rule 9(b) must be enforced so as to accomplish its three goals: (1) providing a defendant fair notice of plaintiff's claim, to enable preparation of his defense; (2) protecting a defendant from harm to his reputation or goodwill; and (3) reducing the number of strike suits. DiVittorio at 1247.

■ To satisfy the particularity requirement of Rule 9(b), a complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements. Cosmas at 11. Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud. DiVittorio at 1247. However, no specific connection between fraudulent representations or omissions need be pleaded as to defendants who are insiders or affiliates personally participating in the statements at issue. DiVittorio at 1247 (offering memorandum); Luce v. Edelstein, 802 F.2d 49, 55 (2d Cir.1986) (same).

■ A complaint may adequately identify the statements alleged to be misrepresentations and properly indicate when, where and by whom they were made, yet still fail Rule 9(b) scrutiny if the complaint does not allege circumstances giving rise to a strong inference that defendant knew the statements to be false, Wexner v. First Manhattan Co., 902 F.2d 169, 173 (2d Cir. 1990), and intended to defraud plaintiff, Ouaknine at 80; Beck v. Manufacturers Hanover Trust Co., 820 F.2d 46, 50 (2d.

Cir.1987), cert. denied, 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

■ Knowledge is a state of mind. So is intent to defraud, or "scienter." While Rule 9(b) permits conditions of mind to be averred generally, the rule also requires that allegations of scienter be supported by facts giving rise to a "strong inference" of fraudulent intent. Ouaknine at 80; Beck at 50; Connecticut National Bank v. Fluor Corp., 808 F.2d 957, 962 (2d Cir. 1987).

Allegations supporting an inference of fraudulent intent frequently include defendant's statement that a fact exists or an event will come to pass coupled with allegations that the fact did not exist or the event did not occur, and circumstances indicating that the statement was false when made. See, e.g., Luce at 56 (alleged misrepresentation in offering memorandum that general partners would make an initial capital contribution of $385,000 and guarantee a $4.5 million construction loan accompanied by allegations that general partners contributed only $80,000 and did not guarantee the loan); DiVittorio at 1248 (offering memorandum's statement that proceeds of offering would be expended as quickly as possible accompanied by allegation that proceeds were never so applied, and estimate that property contained approximately 9,260,000 tons of coal accompanied by allegation that mines did not contain nearly that much). See Ouaknine at 81 for a comparable analysis.

■ To satisfy the scienter requirement, a plaintiff need not allege facts which show a defendant had a motive for committing fraud, so long as plaintiff adequately identifies circumstances indicating "conscious behavior" by the defendant from which an intent to defraud may fairly be inferred. Cosmas at 13. However, where a particular defendant's motive to defraud is not apparent, the strength of the circumstantial allegations must be correspondingly greater. Beck at 50.

The defendant's status and function are important factors. For example, an outside director's liability, if any, must be that of an aider and abettor, a conspirator, or a

substantial participant in fraud perpetrated by others; and conclusory allegations of aiding and abetting or conspiracy are not enough. *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 119 (2d Cir.1982). Where third-party advisers are concerned, the complaint must allege circumstances allowing a strong inference of knowledge of liability. *Devaney v. A.P. Chester*, 813 F.2d 566, 568 (2d Cir.1987) (investment banker).

Allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge. *Luce* at 54 n. 1; *DiVittorio* at 1247–48. However, that exception to Rule 9(b)'s general requirement of particularized pleading does not constitute a license to base claims of fraud on speculation or conclusory allegations. Where pleading is permitted on information and belief, a complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy a relaxed pleading standard. *Wexner* at 172.

In analyzing the amended complaint at bar, I disregard the allegations of fraudulent misrepresentations or omissions in the Memorandum and accompanying sales materials. While such allegations are spread throughout the amended complaint, they cannot form the basis for an action for fraud under plaintiffs' theory of fraudulent inducement as now alleged in the amended complaint. As noted, plaintiffs now allege that the Memorandum and accompanying sales materials were not sent to investors until "subsequent to the sale." ¶ 46. In those circumstances, these materials cannot in law be regarded as furthering a fraudulent scheme "in connection with the purchase or sale of any security," as required by § 10(b). *See Bourdages v. Metals Refining Ltd.*, [1984–85 Transfer Binder] CCH Fed.Sec.L.Rep. § 91,828 at 90,168, 1984 WL 1209 (S.D.N.Y.1984) and cases there cited.

The pleading therefore comes down to such sweeping, conclusory allegations as "Hutton's national network of brokers used high pressure sales tactics," ¶ 43, and that all defendants (without specifying among them) concealed material information or misled plaintiffs, again without giving particulars. ¶ 88, 89.

These allegations of fraud are deficient in a number of the respects discussed in the cases cited *supra*. *See also Center Savings & Loan Association v. Prudential Bache Securities, Inc.*, 679 F.Supp. 274, 278 (S.D.N.Y.1987).

An extended discussion is not necessary, but it is worth noting that the requirement that the pleading inform each of multiple defendants of the nature of the alleged participation in the fraud is not satisfied by this sort of all-inclusive allegations. The amended complaint's reference to Hutton's "national network of brokers" narrows the field somewhat, at least in relation to those defendants not employed by Hutton; but even on that aspect of the case, the amended complaint does not give the required particulars. Plaintiffs' conclusory allegation that all defendants should be characterized as the sort of insiders who share each others' knowledge is not sufficient, given the different status and functions of some of them.

Secondly, to the extent that declarations of unidentified brokers to unidentified investors are quoted, they are for the most part not actionable in fraud. An example is ¶ 44, which alleges that Hutton brokers told clients that Southwest II "was the 'hottest thing to come down the pike' and that Units in Southwest II were difficult to obtain and selling fast." Quite apart from the pleading's failure to allege which brokers made such statements to which investors, these utterances do not constitute representations of fact that could be actionable under the securities laws. *See, e.g., Zerman v. Ball*, 735 F.2d 15, 20–21 (2d Cir.1984) and cases cited.

Plaintiffs' first claim alleging violation of § 10(b) of the 1934 Act is dismissed for failure to allege fraud with the specificity required by Rule 9(b). If they can do so consistent with the requirements of Rule 11, plaintiffs are granted leave to replead this claim within forty-five (45) days of the date of this Opinion and Order.

*The Remaining Claims*

The third, fourth and fifth claims are based upon the common law.[1] No independent source of federal subject matter jurisdiction is alleged, and so these claims are based upon principles of pendent jurisdiction. I decline to retain jurisdiction over them. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The question may be reconsidered if plaintiffs are in a position to plead federal securities fraud with the requisite specificity.

The Clerk of the Court is directed to dismiss the amended complaint, with leave to replead consistent with this Opinion and Order. Since the bases for the Court's decision are universal in their application, the amended complaint will be dismissed as to all defendants.

It is SO ORDERED.

---

**1.** While the parties brief separately plaintiffs' fourth claim, for breach of fiduciary duty, there is no discernible ground for federal subject matter jurisdiction. Rather, as District Judge Walker (as he then was) observed of an identical claim in *Boley v. Pineloch Associates, Ltd.*, 700 F.Supp. 673, 675 (S.D.N.Y.1988), plaintiffs are alleging "breach of common law fiduciary duty." Accordingly plaintiffs must rely upon principles of pendent jurisdiction to maintain the claim in this Court.