**MABON, NUGENT & CO., Plaintiff,**

v.

**George BOREY, William R. Kohler, Michael J. Langevin, Charles F. MacGill, Bruce McKenna, Brian J. McNeary, Wilson M. Meeks, Welles Murphey, Jr., Frank Robinson, Stuart C. Sims and Paul D. Storfer, Defendants.**

**No. 89 Civ. 3986 (CSH).**

United States District Court,
S.D. New York.

June 4, 1991.

Ruskin, Schlissel, Moscou, Evans & Faltischek, Mineola, N.Y. (Robert L. Sherman, Kenneth G. Rothstein, Lisa M. Gigliotti, of counsel), for plaintiff.

Kelley, Drye & Warren, New York City (Kevin J. Walsh, of counsel), for defendants Borey, MacGill, McNeary and Murphey.

Hill, Betts & Nash, New York City (Bernard Persky, of counsel), for defendant Sims.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

In this action plaintiffs assert claims under the federal securities laws, the civil RICO statute, and common law claims under principles of ancillary and pendent jurisdiction. Certain defendants move to dismiss the complaint as to them under Rules 9(b) and 12(b)(6), Fed.R.Civ.P.

### Background

Plaintiff Mabon, Nugent & Co. ("Mabon") is a New York limited partnership and an international investment brokerage firm, holding membership in the New York Stock Exchange and other principal exchanges. On occasion Mabon trades for its own account. Certain such trades give rise to this litigation.

Mabon's amended complaint[1], whose well-pleaded factual allegations are taken as true for the purpose of defendants' Rule 12(b)(6) motion to dismiss, alleges that beginning on August 29, 1986 and ending on May 26, 1988, Mabon entered into a series of transactions involving the purchase of securities of Infra–Red Circuits & Control Corp. ("IRCC"), a New York corporation, and its wholly-owned subsidiary Michael's Art Metals, Inc., a Delaware corporation. Mabon alleges that it was the victim of fraud and negligence in respect of these purchases. IRCC and Michael's Art Metals are not defendants in the action because they are the subject of bankruptcy proceedings under Chapter 7 of the Bankruptcy Code pending in the United States Bankruptcy Court for the Southern District of New York.

The defendants are individuals who Mabon alleges were connected or affiliated in one way or another with IRCC.

Mabon's complaint is based on knowledge as to its own acts and on information and belief as to all other matters. As to the status of the individual defendants, the complaint alleges the following with respect to the pertinent times.

Defendant George Borey was a director of IRCC since January 1, 1985, at relevant times the vice-chairman of the board of directors, and a stockholder of IRCC.

Defendant William R. Kohler is an attorney, acted as legal counsel to IRCC and Michael's Art Metals in connection with the transactions complained of, and was a director of IRCC since August 1987.

Defendant Michael J. Langevin was a director of IRCC and Michael's Art Metals, secretary of the board of directors of IRCC, the chief executive officer of IRCC, a director or officer of many or all of IRCC's subsidiaries, and a substantial stockholder in IRCC. The complaint alleges that on or about June 8, 1988, "Langevin tendered his resignation as an officer and director at the request of IRCC's Board of Directors." ¶ 15.

Defendant Charles F. MacGill was a director of IRCC, vice-president of the company, and a substantial stockholder in IRCC.

Defendant Bruce McKenna was a director of IRCC, a vice-president of one of

---

1. Mabon amended its initial pleading as of right under Rule 15(a). The amended pleading will be referred to throughout this Opinion as the "complaint."

IRCC's subsidiaries since December 1985, and a stockholder of IRCC. Defendant McKenna resigned as a director of IRCC in early 1987.

Defendant Brian J. McNeary was a director of IRCC and a substantial stockholder in the company. He is a partner in the New York Stock Exchange member firm of Murphey, Marseilles, Smith and Nammeck, together with defendant Murphey.

Defendant Wilson M. Meeks was executive vice-president and a chief financial officer of IRCC, a director of IRCC and a substantial stockholder. On or about June 8, 1988 "defendant Meeks tendered his resignation as an officer and director at the request of IRCC's board of Directors." ¶ 19.

Defendant Welles Murphey, Jr. was chairman of IRCC's board of directors and a substantial stockholder in IRCC. Murphey "was involved in the day-to-day operations of [IRCC and Michael's Art Metals] and he and his family have been the primary financial backers of IRCC since the 1960's. He knew defendant Langevin well before Langevin joined IRCC, and was in regular and repeated contact with defendant Langevin, IRCC's chief executive officer." ¶ 20. Murphey was at the relevant times a senior partner of Murphey, Marseilles, Smith & Nammack, "a New York Stock Exchange firm which made various unsecured loans to IRCC and guaranteed a bank loan to IRCC, and was instrumental in setting up IRCC as presently capitalized." *Ibid.*

Defendant Frank Robinson was a director of IRCC beginning in May 1985, an employee of an IRCC subsidiary, and a stockholder of IRCC.

Defendant Stuart C. Sims was president, chief operating officer and a director of IRCC beginning January 1, 1985 and a stockholder of IRCC.

Defendant Paul D. Storfer was vice-president of IRCC, a director of IRCC, president of an IRCC subsidiary, and a stockholder of IRCC.

Mabon alleges that each defendant "reviewed, authorized and participated in the dissemination to Mabon of false and misleading documents and oral communications soliciting Mabon's purchase of the Companies' securities." *See, e.g.,* ¶ 13 in respect of defendant Borey. The word "Companies" refers to IRCC and Michael's Art Metal's.

The complaint alleges several transactions. On August 29, 1986, Mabon and IRCC entered into a stock and warrant purchase agreement pursuant to which Mabon purchased 285,714 shares of IRCC common stock for $1.00 per share, and for $225 purchased a warrant to purchase an additional 225,000 shares at $1.125 per share. Mabon alleges that to induce it to enter into that transaction, "defendants" furnished to Mabon a draft IRCC private placement memorandum dated as of August 11, 1986 as well as financial statements purportedly reflecting IRCC's financial status as of June 30, 1986. The August 29, 1986 agreement represented the private placement memorandum and the financial statements to be "correct, accurate and complete in all material respects," and further provided that "IRCC has disclosed to Mabon all facts material to the assets, prospects, business and financial condition of IRCC." The August 29, 1986 agreement was reviewed and authorized by IRCC's board of directors and executed by defendant Langevin, authorization of the board being an express condition of the agreement. ¶¶ 27–29.

In connection with Mabon's financing of IRCC's acquisition of Michael's Art Metals, by agreements dated October 31, 1986 Mabon purchased a $690,000 secured note issued by Michael's Art Metals due January 31, 1987, and entered into a second stock and warrant purchase agreement pursuant to which Mabon purchased 100,000 shares of IRCC common stock for $.10 a share, as well as a warrant to purchase up to 175,000 additional shares for $.90 a share and a second warrant to purchase 175,000 shares at $1.00 per share. Mabon paid IRCC a total of $10,350 under the October 31, 1986 agreement. Langevin executed the October 31, 1986 agreement after the board of directors authorized it. The $690,000 note has been repaid, but the stock and war-

rants purchased by Mabon in connection with the note have become worthless. ¶¶ 30–32. In December 1986, Mabon purchased from IRCC an additional 200,000 shares of IRCC common stock at $1.50 per share, pursuant to and in reliance on the October 31, 1986 agreement, the "draft Private Placement Memoranda and IRCC's previously delivered financial statements." ¶ 33.

On December 30 and 31, Mabon purchased from IRCC an additional 100,000 and 250,000 shares of IRCC common stock at $1.50 per share, in reliance upon the October 31, 1986 agreement, "an unsigned Stock Purchase Agreement dated as of December 30, 1986," the draft private placement memoranda and IRCC's previously delivered financial statements. ¶ 34.

On January 16, 1987 Mabon entered into a Senior Secured Note and Warrant Purchase Agreement with IRCC, pursuant to which Mabon purchased a note from IRCC in the amount of $300,000 due February 1, 1988, and secured by IRCC's pledge of all the outstanding issued common stock of Michael's Art Metals. Mabon also purchased at this time for $375 a warrant to purchase 375,000 shares of IRCC common stock at $.80 per share. This note agreement was executed by Langevin after the IRCC board of directors reviewed and authorized the agreement. The January 16, 1987 note agreement contains representations that the draft private placement memorandum and financial statements were correct, accurate and complete in all material respects; that IRCC had disclosed to Mabon all facts material to its assets, prospects, business and financial conditions; that all IRCC's representations were true and that no material fact had been omitted; that Michael's Art Metals owned receivables, equipment and inventory having a total value of at least $1,200,000; and that Michael's Art Metals would continue to maintain unencumbered receivables, equipment and inventory having a value of at least $1,100,000 until the $300,000 IRCC note was repaid. ¶¶ 35–37.

On March 3, 1987, Mabon and IRCC entered into two additional stock and warrant purchase agreements for a total purchase of $150,200 in shares and warrants. ¶ 38.

On March 19, 1987, Mabon and IRCC entered into a further warrant purchase agreement which cost Mabon $225. ¶ 39.

Mabon's final transaction with IRCC was entered into on May 26, 1988. On that date Mabon and IRCC entered into an amendment dated May 1, 1988 to the $300,000 IRCC note originally due February 1, 1988. The due date was deferred to October 1, 1988, with all other terms and provisions of the note and its exhibits remaining in full force and effect. ¶ 40.

On June 17, 1988 IRCC filed a Chapter 11 bankruptcy petition. Michael's Art Metals filed a Chapter 11 petition on June 20, 1988. Both cases have been converted into Chapter 7 liquidations, and a trustee appointed for both companies. The majority of IRCC's other operation subsidiaries were also made subjects of bankruptcy proceedings at the same time. ¶ 43.

Mabon alleges that each of these transactions was induced by the IRCC draft private placement memorandum, the financial statements, and other representations and promises given at the time of each transaction, together with representations "made by defendants in oral statements which accompanied the negotiations of those documents and the transactions thereby contemplated," ¶ 49. These representations were fraudulent in that they contained misrepresentations and omissions of facts, in particulars which Mabon specifically alleges in ¶ 49.

In these circumstances, Mabon asserts ten claims against all defendants, as follows: first, for violation of § 12(2) of the Securities Act of 1933 and liability under § 15 of that act; second, for violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder, and liability under § 20 of that statute; third, for violation of § 17(a) of the 1933 Act; fourth, for aiding and abetting violations of § 17(a) of the 1933 Act and § 10(b) of the 1934 Act; fifth, for violation of the civil RICO statute, 18 U.S.C. § 1962(b); sixth, for violation of civil RICO, § 1962(c); seventh, for conspiring to violate civil

RICO in violation of § 1962(d); eighth, for common law fraud; ninth, for aiding and abetting common law fraud; and tenth, for negligent misrepresentation and negligence.

Defendants Borey, MacGill, McNeary, Murphey, Sims and Robinson have moved under Rules 9(b) and 12(b)(6) to dismiss the complaints as to them. Mabon has not opposed the motion on behalf of Robinson, which will be granted for that reason. As to the other moving defendants, Mabon defends the sufficiency of its pleading.

### Discussion

**The Claims Under § 17(a) of the 1933 Act**

■ Plaintiffs assert claims against all defendants under § 17(a) of the 1933 Act. I dismiss those claims because that section of the statute does not create a private right of action.

In *Kirshner v. United States*, 603 F.2d 234, 241 (2d Cir.1978), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979), the Second Circuit held that a private cause of action is available under § 17(a). The Second Circuit reasoned in *Kirshner* that § 17(a) was essentially identical to § 10(b) of the 1934 Act where a private cause of action was implied. 603 F.2d at 241. However, as the Second Circuit recently recognized in *Wexner v. First Manhattan Co.*, 902 F.2d 169, 173 (2d Cir. 1990), that determination "has been severely, and perhaps fatally, undercut by the Supreme Court's ruling to the contrary in *Aaron v. SEC*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980)."

As *Wexner* goes on to observe, the reasoning of *Kirshner* has been questioned by subsequent Second Circuit opinions, *Yoder v. Orthomolecular Nutrition Institute, Inc.*, 751 F.2d 555, 559 n. 3 (2d Cir.1985); *Zerman v. Ball*, 735 F.2d 15, 23 (2d Cir. 1984); has been criticized by legal scholars; and a number of district courts have concluded, notwithstanding *Kirshner*, that no private cause of action can be implied from § 17(a). *See* district court cases collected at 902 F.2d 174. While leaving the question open, the *Wexner* court said at 174: "It is apparent that the vitality of our

holding in *Kirshner* is in doubt, and the existence of a private right of action under section 17(a) is in need of re-examination."

This Court has previously held that § 17(a) confers no private cause of action. *Ackerman v. Clinical Data, Inc.*, No. 84 Civ. 5400, 1985 WL 1884 (S.D.N.Y.1985) (LEXIS, GENFED library Dist. file). The Second Circuit in *Wexner* cited *Ackerman* among the district court opinions collected at 902 F.2d 174. Given the Second Circuit's recent questioning of *Kirshner*'s vitality, I see no basis for departing from the conclusions I reached in *Ackerman*.

The § 17(a) claims against all defendants will be dismissed without leave to replead.

**The Claims Under § 12(2) and 15 of the 1933 Act**

■ Mabon charges all defendants with violating § 12(2) of the 1933 Act, 15 U.S.C. § 77*l*, or in the alternative acting as controlling persons of those who did violate § 12(2), thereby subjecting themselves to joint and several liability under § 15 of the statute, 15 U.S.C. § 77*o*.

§ 12(2) imposes liability to the purchaser of a security upon any person who

offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission ...

In *Pinter v. Dahl*, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), the Supreme Court defined the boundaries of a "statutory seller" under § 12(1) of the 1933 Act. The Second Circuit regards the language in subsections 12(1) and 12(2) as identical in meaning, and accordingly applies the *Pinter* analysis to § 12(2) claims. *See Wilson*

*v. Saintine Exploration and Drilling Corp.*, 872 F.2d 1124, 1126 (2d Cir.1989).

*Pinter* limits the primary liability of statutory sellers under § 12 to "persons who pass title and persons who 'offer,' including those who 'solicit' offers." The Court observed that § 12's

> failure to impose express liability for mere participation in unlawful sales transactions suggests that Congress did not intend that this section impose liability on participants collateral to the offer or sale. 486 U.S. at 650, 108 S.Ct. at 2080.

While the Second Circuit in *Katz v. Amos Treat & Co.*, 411 F.2d 1046, 1053 (2d Cir. 1969), had visited § 12 statutory sellers' liability upon an attorney who had been "a party to the solicitation," the Supreme Court in *Pinter* specifically rejected *Katz:*

> [T]he "party to a solicitation" concept could easily embrace those who merely assist in an other's solicitation efforts.... It is difficult to see more than a slight difference between this approach and the participation theory, which we have concluded does not comport with Congress' intent. *Id.* 486 U.S. at 651 n. 27, 108 S.Ct. at 2081 n. 27.

As the Second Circuit acknowledged in *Wilson* at 1126–27: "Justice Blackmun's opinion [in *Pinter*] expressly disapproved of the rationale of the leading decision in this Circuit," namely *Katz.*

█ Under *Pinter*, a person is liable as a § 12 statutory seller of a security only if he passed title to the purchaser, offered to sell the security, or solicited the sale, motivated at least in part by a desire to serve his own financial interests or those of the securities owner. 486 U.S. at 641–48, 108 S.Ct. at 2075–79. Unless one of these factors is present, substantial participation in causing the sales to take place, even if accompanied by scienter, is insufficient to bring a defendant within the ambit of § 12(2). *Id.* at 648–654, 108 S.Ct. at 2079–82.

While the Supreme Court in *Pinter* left the question open, 486 U.S. at 648 n. 24, 108 S.Ct. at 2079 n. 24, the Second Circuit has held that "persons who do not meet the *Pinter* test for statutory sellers may not be held liable under Section 12 as aiders and abettors," *Wilson* at 1127, expressing its agreement with an *amicus* brief submitted by the Securities Exchange Commission.

The complaint fails to state a § 12(2) claim against any moving defendant. The only allegations with respect to direct solicitation and negotiation of the sale of IRCC securities to Mabon relate to defendants other than the moving defendants. The pertinent allegations appear in ¶ 57:

> Defendants Langevin, Meeks and Kohler were and are sellers and/or offerors also by reason, *inter alia*, of their direct solicitation of Mabon's purchases of the Securities and substantial participation in the negotiations with Mabon over the purchases of the Securities including through direct contact, and use of instrumentalities of interstate commerce, including the United States mails and interstate telephone communications. Defendants Langevin and Kohler also directly negotiated both a) the IRCC Note Agreement and Amendment each containing a covenant to maintain $1,100,000 in unencumbered assets of Michael's Art Metals receivables, and b) the CCC financing agreements which created a lien against all of Michael's Art Metals' assets.

As for the other defendants, they are alleged to have been "sellers or offerors" by reason of their review, approval and authorization of the offer, solicitation, and sale of securities to Mabon by means of the several documents alleged; their knowledge of the material untrue statements and omissions contained in those documents, or the knowledge they would have had but for their lack of exercise of reasonable care; and their financial interest in the sale of the securities to Mabon resulting from their positions as directors, and officers of the companies and their significant equity holdings in IRCC. ¶ 57. While ¶ 58 goes on to allege that all the "defendants" sold or offered the securities to Mabon "by the use of prospectuses (the securities documents) and oral communications" containing fraudulent misrepresentations and omissions, everyone is lumped together, no

particulars are pleaded, and the allegation is deficient under Rule 9(b). *See* discussion of the § 10(b) claims, *infra.*

These allegations against the moving defendants are insufficient in law to state a § 12(2) claim. While on a motion to dismiss the court must accept all material allegations as true, *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), "legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness." 2A *Moore's Federal Practice* (2d ed. 1989) at 12–63–64. Therefore I look not to the complaint's conclusory characterizations of each defendant as a seller or offeror, but rather to the particular allegations of what each defendant did.

No moving defendant is alleged to have sold his IRCC shares to Mabon. No moving defendant is alleged to have solicited Mabon's purchases. That was the functions of Langevin, Meeks and Kohler. No moving defendant is alleged to have participated in the negotiations concerning the underlying financial documents. That was the function of Langevin and Kohler. The main thrust of Mabon's § 12(2) claim against the moving defendants is that they were members of the board of directors which authorized the transactions. That clearly appears from plaintiff's brief in opposition at 10:

> Critical here is the fact that the documents comprising the fraudulent transaction were specifically subject to the approval of the board of directors, including, of course, the moving defendants.... The directors were required to review and approve each phase of the transaction.... Such review and approval were, in fact, prerequisites to Mabon's purchase.

■ A director's act in authorizing the sale of a company's securities is not sufficient to constitute him a seller of those securities under § 12(2). On the contrary: such individuals are quintessentially collateral participants; and *Pinter* teaches that this will not do. Even under the Second Circuit's now discredited analysis in *Katz,* § 12 was not construed to visit liability

upon a corporate officer and director who signed the stock certificate for one of the transactions. *See* 411 F.2d at 1053 ("We do not think § 12(1) was intended to embrace a corporate officer or director merely because he has knowledge of a sale of unregistered stock and plays such a minor role in facilitating it.")

To be sure, plaintiff at bar alleges that the moving defendants had knowledge of fraud; but as Judge Nickerson held in *Bernstein v. Crazy Eddie, Inc.,* 702 F.Supp. 962, 975 (E.D.N.Y.1988), "substantial participation in causing the sales to take place, even if accompanied by scienter," does not suffice to state a § 12 claim (citing *Pinter* and *Capri v. Murphy,* 856 F.2d 473 (2d Cir.1988)).

Mabon relies upon *Capri* for the proposition that a § 12 statutory seller need not have direct communication with investors. That is so; but the defendants found in *Capri* to have been sellers within the meaning of § 12(2) were the general partners of the seller who prepared and circulated the fraudulent prospectus to the purchasers. Mabon makes no comparable allegation against any moving defendant.

Mabon's claims against the moving defendants for primary liability under § 12 of the 1933 Act will be dismissed. The claims against them as controlling persons under § 15 is dismissed *infra.*

### The Claims Under § 10(b) of the 1934 Act

Mabon charges all defendants with participating in a fraudulent scheme in violation of § 10(b) of the 1934 Act.

Before analyzing the amended complaint, it is useful to review pertinent Second Circuit authority on fraud pleading.

■ Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Rule 9(b) must be read together with Rule 8(a) which requires only a "short and plain statement" of the claims for relief. *Ouaknine v. MacFarlane,* 897 F.2d 75, 79 (2d Cir.1990); *DiVittorio v. Equidyne Extrac-*

*tive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987). On a motion to dismiss, the court assumes the truth of plaintiff's factual allegations, *Ouaknine* at 78, reads the complaint generously, and draws all inferences in favor of the pleader. *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989); *Yoder v. Orthomolecular Nutrition Institute, Inc.*, 751 F.2d 555, 562 (2d Cir.1985). But Rule 9(b) must be enforced so as to accomplish its three goals: (1) providing a defendant fair notice of plaintiff's claim, to enable preparation of his defense; (2) protecting a defendant from harm to his reputation or goodwill; and (3) reducing the number of strike suits. *DiVittorio* at 1247.

■ To satisfy the particularity requirement of Rule 9(b), a complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements. *Cosmas* at 11. Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud. *DiVittorio* at 1247. However, no specific connection between fraudulent representations or omissions need be pleaded as to defendants who are insiders or affiliates personally participating in the statements at issue. *DiVittorio* at 1247 (offering memorandum); *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir.1986) (same).

■ A complaint may adequately identify the statements alleged to be misrepresentations and properly indicate when, where and by whom they were made, yet still fail Rule 9(b) scrutiny if the complaint does not allege circumstances giving rise to a strong inference that defendant knew the statements to be false, *Wexner v. First Manhattan Co.*, 902 F.2d 169, 173 (2d Cir. 1990), and intended to defraud plaintiff, *Ouaknine* at 80; *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

■ Knowledge is a state of mind. So is intent to defraud, or "scienter." While Rule 9(b) permits conditions of mind to be averred generally, the rule also requires that allegations of scienter be supported by facts giving rise to a "strong inference" of fraudulent intent. *Ouaknine* at 80; *Beck* at 50; *Connecticut National Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987).

Allegations supporting an inference of fraudulent intent frequently include a defendant's statement that a fact exists or an event will come to pass coupled with allegations that the fact did not exist or the event did not occur, and circumstances indicating that the statement was false when made. *See, e.g., Luce* at 56 (alleged misrepresentation in offering memorandum that general partners would make an initial capital contribution of $385,000 and guarantee a $4.5 million construction loan accompanied by allegations that general partners contributed only $80,000 and did not guarantee the loan); *DiVittorio* at 1248 (offering memorandum's statement that proceeds of offering would be expended as quickly as possible accompanied by allegation that proceeds were never so applied, and estimate that property contained approximately 9,260,000 tons of coal accompanied by allegation that mines did not contain nearly that much). *See Ouaknine* at 81 for a comparable analysis.

■ To satisfy the scienter requirement, a plaintiff need not allege facts which show a defendant had a motive for committing fraud, so long as plaintiff adequately identifies circumstances indicating "conscious behavior" by the defendant from which an intent to defraud may fairly be inferred. *Cosmas* at 13. However, where a particular defendant's motive to defraud is not apparent, the strength of the circumstantial allegations must be correspondingly greater. *Beck* at 50.

■ The defendant's status and function are important factors. For example, an outside director's liability, if any, must be that of an aider and abettor, a conspirator, or a substantial participant in

fraud perpetrated by others; and conclusory allegations of aiding and abetting or conspiracy are not enough. *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 119 (2d Cir.1982). Where third-party advisers are concerned, the complaint must allege circumstances allowing a strong inference of knowledge of falsity and intent to defraud. *Devaney v. A.P. Chester*, 813 F.2d 566, 568 (2d Cir.1987) (investment banker).

■ Allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge. *Luce* at 54 n. 1. *DiVittorio* at 1247–48. However, that exception to Rule 9(b)'s general requirement of particularized pleading does not constitute a license to base claims of fraud on speculation or conclusory allegations. Where pleading is permitted on information and belief, a complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy a relaxed pleading standard. *Wexner* at 172.

In the case at bar, ¶ 49 of the complaint, which at sub-paragraph G incorporates by reference the substance of the allegations of ¶ 7, adequately sets forth the fraudulent misrepresentations and omissions upon which Mabon relies. I reject the contention made by counsel for the Borey group of defendants that these allegations amount to nothing more than mismanagement. Some of the incidents plaintiffs include in their seven-page list comprising ¶ 49 may be so characterized, but others clearly may not, such as withholding of the adverse financial information concerning IRCC alleged in sub-paragraph C.

Thus the complaint sufficiently alleges, with respect to the documents identified in the pleading, the manner in which those documents are said to be misleading.

■ The allegations of oral misrepresentations do not satisfy Rule 9(b) in any respect. ¶ 49 the complaint alleges that plaintiff was defrauded by misrepresentations and omissions of fact "made by defendants in oral statements which accompanied the negotiation of these documents and the transactions thereby contemplated ..." That allegation is entirely deficient, since Mabon does not say what the oral statements were, when and where they were made, who made them and in what respect they were fraudulent. The problem is compounded by the fact that Mabon sues multiple defendants, each of whom is entitled to be informed of the nature of his participation in the fraud.

Mabon does not allege that defendants Borey, McNeary, or Murphy were at any time officers or managerial employees of IRCC. They must accordingly be regarded as "outside" directors; and the allegations of fraud against them are insufficient under the cases cited *supra*.

Murphey's status as an outside director is not altered by the allegation in ¶ 20 of the complaint that he "was involved in the day-to-day operations of the Companies ..." The nature of that involvement and the scope of his managerial responsibilities, if any, are left entirely to the imagination. That does not satisfy Rule 9(b), particularly where the complaint alleges elsewhere that the direct solicitations and negotiations took place between plaintiff and other defendants who were officers of IRCC.

As for MacGill, Mabon alleges at ¶ 16 of the complaint that at some time he served as a vice-president of IRCC. MacGill submits a declaration that while he has served as a director of IRCC since 1984, at no time has he served as an officer of that company or any of its subsidiaries. I cannot consider that declaration, which falls outside the pleadings, on a motion to dismiss under Rule 12(b)(6). If there is to be further motion practice in which MacGill's status is pertinent the motion to dismiss must be converted into one for summary judgment under Rule 56.

The same situation arises with respect to defendant Sims. ¶ 22 of the complaint alleges that he served as president, chief operating officer and a director of IRCC "beginning January 1, 1985." Sims submits an affidavit stating that he resigned his positions as an officer and director of IRCC as of February 6, 1987, and had no contact with the company since that date. He argues that most of the alleged fraudulent transactions occurred after his resig-

nation. Again, I cannot consider that affidavit on a motion to dismiss.

In any event, if Mabon wishes to press its claims of oral misrepresentations or omissions, it must further amend its pleading to comply with Rule 9(b).

■ The allegedly fraudulent documents generated by Mabon's several transactions with IRCC stand on a different footing. The recurrent theme in those documents is that IRCC and Michael's Art Metals were in sound fiscal condition with promising economic prospects. The present motions raise the sufficiency of the complaint's allegations that the moving defendants knew that those written representations were false, and intended to defraud Mabon.

In that regard, Mabon alleges at ¶ 7 of the complaint that in October 1986 a "respected" (in contrast, one supposes, with "disreputable") law firm representing another company "specifically informed each of the defendants in writing" in a letter that IRCC had defrauded that law firm's client. That letter, dated October 31, 1986, was sent by the firm of Gibson, Dunn & Crutcher on behalf of a company called Orion. Mabon quotes the law firm's letter of in ¶ 7. The letter read in part:

> IRCC, its control persons, executive officers, directors and employees have violated the statutory provisions and have committed actions giving rise to breach of contract and tort actions under the laws of the United States and the United Kingdom by making untrue statements of material fact to the Shareholders and by omitting to state material facts necessary in order to make certain factual statements made by IRCC, its control persons, executive officers, directors and employees not misleading. The Shareholders believe that these untrue statements and omissions concerned, among other things: (i) the financial position of IRCC before the date of the Sale Agreement, including the failure of IRCC to meet its employee payroll and the existence of an Internal Revenue Service lien on certain IRCC bank accounts; (ii) the financial statements of IRCC; (iii) the future prospects of IRCC; (iv) the existence of material lawsuits against IRCC; and (v) the value of the IRCC Shares delivered to the Shareholders in exchange for the Orion Shares and the Subsidiaries Shares.

Lawyers, even respected ones, have not yet achieved that state of grace where every charge they make on behalf of a client must be regarded as true. However, Mabon alleges in ¶ 49 of its complaint a detailed series of material misrepresentations and omissions whose factual aspects closely parallel the misrepresentations and omissions complained of by the law firm in its October 31, 1986 letter. *Compare, e.g.*, the first specification of fraud in counsel's letter, "the failure of IRCC to meet its employee payroll and the existence of an Internal Revenue Service lien on certain IRCC bank accounts," with ¶ 49C, "failure to pay withholding and corporate taxes and to file tax returns as required by law" and "failure to discharge federal and state tax liens." It appears from the complaint that Mabon learned of what it complains of in ¶ 49 as a result of hearings held in the bankruptcy court after IRCC and Michael's Art Metals filed their bankruptcy petitions in June 1988. Much of what the Gibson Dunn firm complained of in October 1986 appears to have come to pass in June 1988.

For Rule 12(b)(6) purposes I assume the truthfulness of Mabon's allegation that each of the defendants, non-moving and moving, received copies of Gibson, Dunn's October 31, 1986 letter. Accordingly the questions arise: what, if anything, they did about such serious charges; and how their conduct relates to the repeated representations given to Mabon.

The moving defendants' reply briefs make no reference to the Gibson, Dunn letter of October 31, 1986 and the allegations in ¶ 7 of the complaint. But it seems plain that, giving the complaint the requisite generous reading and drawing all inferences in favor of Mabon, the chronology of events—serious charges being asserted in October 1986, repeated reassurances and representations being given to Mabon during 1986 and 1987, and corporate bankrupt-

cy in 1988 revealing conditions consistent with the October 1986 charges—are sufficient to raise an inference of knowledge and scienter on the part of all directors of IRCC, who, as the complaint alleges, were required to authorize the transactions with Mabon.

Even if all moving defendants should be regarded as outside directors, the complaint sufficiently alleges § 10(b) liability, as aiders and abettors or as control persons under § 20(a) of the 1934 Act. In *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1299 (2d Cir. 1973), a case upon which the moving defendants rely, the Second Circuit said of § 20 that its purpose was "to impose liability only on those directors who fall within its definition of control and who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons." However, the court of appeals went on to observe at 1302 in the Rule 10b–5 context:

> We recognize that *participation* by a director in the dissemination of false information reasonably calculated to influence the investing public may subject a director to liability under the Rule. But it is quite a different matter to hold a director liable in damages for failing to insure that all material, adverse information is conveyed to prospective purchasers of the company's stock absent substantial participation in the concealment or knowledge of it. Absent knowledge or substantial participation we have refused to impose such affirmative duties of disclosure upon Rule 10b–5 defendants. (emphasis in original)

*Lanza* dealt with the liability of one Coleman, a director of the corporation in question, whom the district court found "did not know of, or knowingly participate in, any deception practiced upon plaintiffs," 479 F.2d at 1289. Mabon's complaint, in contrast, alleges sufficient knowledge and participation on the part of all defendants to survive a motion to dismiss. A complaint may be dismissed under Rule 12(b)(6) only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69,

73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). Mabon's complaint survives that threshold analysis, at least with respect to its charge that all defendants aided and abetted a § 10(b) violation.

The Second Circuit in *Wilson*, construing *Pinter*, held that aiding and abetting could not impose liability under § 12 of the 1933 Act. But the Court of Appeals was careful to observe that: *"Pinter*'s holding that collateral participants who do not solicit sales cannot be held liable under Section 12(2) in no way diminishes their potential liability under Section 10(b)." 872 F.2d at 1127. As to § 10(b), to establish aiding and abetting liability a plaintiff must prove; (1) a securities law violation by the primary wrongdoer; (2) knowledge of the purported violation on the part of the aider and abetter; and (3) conduct by the aider and abetter constituting substantial assistance in achieving the primary wrongdoer's fraud. *See Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983). Scienter is required; and at least where there is a fiduciary duty, reckless disregard for the truth is the equivalent of scienter. *Lanza v. Drexel & Co., supra*, at 1301; *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 44 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978).

Mabon argues that the defendants owed it a fiduciary duty, citing *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), and this Court's opinion in *Drobbin v. Nicolet Instrument Corp.*, 631 F.Supp. 860, 899 (S.D.N.Y.1986). Neither case is squarely in point. *Pepper* concerned a corporate director's fraud upon creditors, and *Drobbin* a majority or controlling shareholder's fiduciary duty to the corporation and its minority shareholders. But assuming the moving defendants owed no fiduciary duty to Mabon, the complaint sufficiently alleges a claim of aiding and abetting the fraud of others. The Borey group argues in its reply brief at 16 that *Lanza* demonstrates "the lack of duty (and hence liability) for non-participant directors in a securities fraud." The argument assumes

its basic premise of non-participation. Given the allegations of the defendants knowledge of the Gibson, Dunn charges in October 1986, the subsequent representations made to Mabon, and the intervening bankruptcies, I am not prepared to hold that the defendants are entitled to a dismissal of the § 10(b) claims against them.[2]

Whether Mabon can prove such a theory of liability remains to be seen. Defendants may be in a position to move for summary judgment after discovery. It is also useful to stress the limited basis of this holding. The complaint survives Rule 9(b) analysis only insofar as Mabon complains of the directors' actions in authorizing the several transactions and the representations made on behalf of IRCC to Mabon at those times. The allegations in the complaint to oral representations will be stricken, and no proof concerning them admitted, unless Mabon files a further amended complaint with respect to them in compliance with Rule 9(b). In offering such a further amendment, Mabon and counsel must of course be mindful of the requirements of Rule 11.

For these reasons, defendants' motion to dismiss the second and fourth claims are denied, insofar as those claims relate to § 10(b) of the 1934 Act and SEC Rule 10b–5 promulgated thereunder.

The Claims Against the Moving Defendants as "Control Persons"

 Having considered defendants' liability under § 10(b) of the 1934 Act, I turn to the claims that they are secondarily liable as control persons under § 15 of the 1933 Act and § 20 of the 1934 Act.

As for liability under § 12 of the 1933 Act, the Second Circuit held in *Wilson* that aiding and abetting as a basis of liability could not be asserted, particularly after the Supreme Court's decision in *Pinter*. But § 15 was not at issue in *Pinter*, and the Court did not consider it. *See* 486 U.S. at 642 n. 19, 108 S.Ct. at 2076 n. 19. In *Wilson* the Second Circuit agreed with the

SEC's brief that the concept of aiding and abetting, derived from tort and criminal law, had no appropriate part to play in fixing liability under § 12. Clearly, however, the *Pinter* rationale cannot be interpreted to repeal § 15 liability, particularly where, as noted, the Court did not consider that section.

The standards for secondary liability as control persons under § 15 of the 1933 Act and § 20 of the 1934 Act are essentially the same. *Lanza* at 1299. It is clear that liability does not fall upon an individual "solely from signing a registration statement or occupying a status such as that of a director." *Lanza* at 1298–99 (quoting *Folk*, Civil Liabilities under the Federal Securities Acts, 55 Va.L.Rev. 1, 206 (1969)). *See also Hemming v. Alfin Fragrances, Inc.*, 690 F.Supp. 239, 245 (S.D.N.Y.1988) ("A person's status as an officer, director or shareholder, absent more, is not enough" to show that he controlled the corporation.) But directors "who fall within [t]he definition of control and who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons" are liable. *Lanza* at 979. It is not entirely clear which corporate directors fall within the statutory "definition of control" and which do not; typically, each director casts a single vote. In any event, the complaint sufficiently alleges the directors' control of the IRCC insiders by their review and approval of the representations and transactions; and the participation of the moving defendants in the alleged fraud has also been sufficiently pleaded, for the reasons stated *supra*.

I conclude that the claims asserting liability against these defendants as control persons under § 15 of the 1933 Act and § 20 of the 1934 Act survive the motion to dismiss.

The Civil RICO Claims

Mabon alleges that all defendants violated §§ 1962(b) and (c) of **RICO** and conspired to do so in violation of § 1962(c).

---

**2.** Liability may be visited upon even an outside director if there was "an agreement between the director and one or more others to accomplish the wrongful purpose of violating § 10(b)".

*Decker v. Massey–Ferguson Ltd., supra,* at 119. Mabon's complaint contains allegations permitting the inference of such an agreement, at least sufficiently to survive a motion to dismiss.

The predicate acts alleged are violations of the mail fraud statute, 18 U.S.C. § 1341, and the wire fraud statute, 1343.

■ The complaint does not state a cause of action under **1962(b).** That section provides:

It shall be unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, an interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

All the fraudulent predicate acts alleged in the complaint were for the purpose of selling IRCC Securities to Mabon, thereby wrongfully separating Mabon from its funds. That alleged pattern of racketeering activity has nothing to do with the defendants' acquiring or maintaining an interest in or control of IRCC and its subsidiaries, the alleged RICO enterprise. § 1962(b) requires a showing of a relationship or nexus between the pattern of racketeering activity alleged and the interest or control obtained in the designated enterprise. *Litton Industries v. Lehman Bros. Kuhn Loeb, Inc.,* 709 F.Supp. 438, 452 (S.D.N.Y.1989); *see also Bernstein v. Crazy Eddie, supra,* at 981 ("[The complaint] nowhere suggests that defendants' profits from their supposed pattern of racketeering activity were used to acquire control of Crazy Eddie; rather, they are alleged to have taken the money and run.")

■ Mabon's remaining RICO claims are violation of § 1962(c) and conspiracy to do so in violation of § 1962(d). Because the predicate acts sound in fraud, Mabon's RICO complaint must satisfy the requirements of Rule 9(b). *Bennett v. Berg,* 685 F.2d 1053, 1062 (8th Cir.1982). The complaint does not do so.

■ At ¶ 89, the complaint alleges a series of telephone calls, telecopies, and mail communications sent to Mabon by individuals other than the moving defendants, primarily defendants Meeks and Langevin. Notwithstanding those specific allegations, "the defendants" are alleged to have committed the predicate acts in the introductory language to ¶ 89; and ¶ 90 alleges that "[e]ach of the defendants aided and abetted each of the acts and omissions of the others." The complaint's shotgun indictment of all defendants in connection with these particular acts does not satisfy Rule 9(b); nor may aiding and abetting, or conspiracy, be alleged as to each defendant in so conclusory a fashion.

Ordinarily I would dismiss the § 1962(c) and (d) claims with leave to replead. However, an additional issue arises with respect to the viability of Mabon's RICO claim. The parties have not addressed that issue in their briefs but the Court raises it *sua sponte* because the question goes to subject matter jurisdiction.

§ 1962(c) makes it unlawful for persons employed by or associated with enterprises engaged in interstate or foreign commerce to conduct the affairs of such an enterprise "through a pattern of racketeering activity ...." In *H.J., Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Supreme Court undertook to identify and define the ingredients and boundaries of a "pattern of racketeering activity." Justice Brennan's opinion commanded only a 5–4 majority, but it represents the Court's most recent articulation of the governing principles.

*H.J.* holds that a "pattern of racketeering activity" requires the combination of predicate acts related to each other and continuity of conduct. 492 U.S. at 239, 109 S.Ct. at 2900.

As for relatedness, the *H.J.* majority derived from Title X of the Organized Crime Control Act of 1970, of which RICO formed Title IX, the rule that to be related, predicate acts must have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240, 109 S.Ct. at 2901.

However, the Court continued, the relatedness of racketeering activities is not sufficient to satisfy § 1962's "pattern" element. "To establish a RICO pattern it must also be shown that the predicates themselves amount to, or that they other-

wise constitute a threat of, *continuing* racketeering activity." *Ibid.* (emphasis in original). As to continuity, the *H.J.* majority wrote:

> "Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. *See Barticheck v. Fidelity Union BAnk/First National State,* 832 F.2d 36, 39 (CA3 1987). It is, in either case, centrally a temporal concept—and particularly so in the RICO context, where *what* must be continuous, RICO's predicate acts or offenses, and the *relationship* these predicates must bear one to another, are distinct requirements. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated. *See* S.Rep. No. 91–617, at 158.

*Id.* 492 U.S. at 241–42, 109 S.Ct. at 2901–02 (emphasis in original).

The civil complaint in *H.J.* alleged that at different times over the course of at least a six-year period telephone company officers and employees gave members of a state regulatory commission bribes in order to obtain approval of unfair and unreasonable utility rates. The Court noted plaintiff's "claim that the racketeering predicates occurred with some frequency at least over a six-year period, which *may* be sufficient to satisfy the continuity requirement." *Id.* at 250, 109 S.Ct. at 2906 (emphasis added). The case was remanded to the district court for further proceedings consistent with the Court's opinion.

In *Beauford v. Helmsley,* 865 F.2d 1386 (2d Cir.) (en banc), *vacated and remanded,* 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584, *original decision adhered to,* 893 F.2d 1433 (2d Cir.1989), plaintiffs alleged that defendants made a number of material misrepresentations in an offering plan for the conversion of an apartment complex into condominiums. The plan was mailed to more than 8000 addressees. The complaint alleged additional facts sufficient to justify an inference that defendants would in the future be mailing further, equally fraudulent amendments to the offering plan. The Second Circuit held these allegations sufficient to describe a pattern of racketeering activity. The en banc majority and the three dissenting judges in *Beauford* agreed that the concepts of "relatedness" and "continuity" were crucial; and, in a departure from prior Second Circuit authority, observed that "our analysis of relatedness and continuity has shifted from the enterprise element to the pattern element." 865 F.2d at 1391. That shift presaged the Supreme Court's analysis in *H.J.,* which had not yet been decided.

In *Beauford* the Second Circuit defined Congress' goal in defining "pattern of racketeering activity" as to exclude from the reach of RICO criminal acts that were merely "isolated" or "sporadic." Consequently, Judge Kearse wrote for the en banc majority, "we must determine whether two or more acts of racketeering activity have sufficient interrelationship and whether there is sufficient continuity or threat of continuity to constitute such a pattern." *Id.* at 1391. Where the enterprise itself is associated with organized crime, that fact alone is sufficient to "tend to belie any notion that the racketeering acts were sporadic or isolated." *United States v. Indelicato,* 865 F.2d 1370, 1384 (2d Cir.1989) (en banc, decided with *Beauford*).

> When, however, there is no indication that the enterprise whose affairs are said to be conducted through racketeering acts is associated with organized crime, the nature of the enterprise does not of itself suggest that racketeering acts will continue, and proof of continuity of racketeering activity must thus be found in some factor other than the enterprise itself.

*Beauford* at 1391.

The complaint in *Beauford* was legally sufficient for these reasons:

> In sum, read with ordinary charity, the amended complaint alleged that on each of several occasions defendant had mailed fraudulent documents to thousands of persons and that there was reason to believe that similarly fraudulent mailings would be made over an additional period of years. These allegations sufficed to set forth acts that cannot be deemed, as a matter of law, isolated or sporadic.
>
> *Id.* at 1392.

The Supreme Court granted *certiorari* in *Beauford*, vacated the Second Circuit's judgment, and remanded the case to that court for further consideration in light of *H.J.* The Second Circuit gave *Beauford* that mandated further consideration and adhered to its en banc decision. 893 F.2d 1433 (2d Cir.1989).

*See also Jacobson v. Cooper,* 882 F.2d 717, 720 (2d Cir.1989) (continuity is sufficiently alleged where related predicates extend over "a matter of years."); *Official Publications, Inc. v. Kable News Co.,* 884 F.2d 664, 666–68 (2d Cir.1989) (allegedly fraudulent acts occurred "pursuant to a longstanding contract, over a considerable period of time"; contracts in suit were dated 1974 and 1980); *Procter & Gamble v. Big Apple Industrial Buildings, Inc.,* 879 F.2d 10, 18 (2d Cir.1989) ("the complaint must provide allegations sufficient to infer that an enterprise exists, and that the acts of racketeering were neither isolated nor sporadic;" allegations sufficient which claimed "that defendants engaged in at least five separate fraudulent schemes"). In *Creative Bath Products, Inc. v. Connecticut General Life Insurance Co.,* 837 F.2d 561, 564 (2d Cir.1988), the Second Circuit followed its own precedent and anticipated *H.J.* in holding that the plaintiffs failed to allege RICO "continuity" where their case "consisted of the proposition that defendants had made three fraudulent representations in pursuit of a single short-lived goal," *i.e.,* the sale of four insurance policies on the lives of two individuals.

In the case at bar, it is difficult to discern open-ended continuity, since both IRCC and Michael's Art Metals are in Chapter 7 bankruptcy liquidation, and there is no allegation that any defendants are engaged in ongoing, comparable fraudulent activity.

As to closed-end continuity, the case involves purchases by Mabon of IRCC securities during a period from August 1986 to May 1988 (that being the date of amendment of the $300,000 IRCC note).[3] The question that arises under *H.J.* and Second Circuit authority is whether purchases of securities of a single company accomplished in less than two years, with no allegation of continuing fraudulent activity, satisfies the continuity requirement of RICO pleading.

Since the parties did not address this issue in their briefs, additional briefs on the point will be required.

The Pendent Common Law Claims

The eighth and ninth claims, which sound in common law fraud, survive the motion to dismiss because the federal securities law fraud claims survive it. However, these claims do not fully comply with Rule 9(b). They will be limited in their scope and proof just as the § 10(b) claim will be limited, unless Mabon files a further amended complaint.

The tenth claim, alleging negligent misrepresentation, is dismissed because the governing New York law requires that the negligent statement be "expressed directly" by the defendant to the person relying upon the negligent statement. *White v. Guarente,* 43 N.Y.2d 356, 362–63, 401 N.Y. S.2d 474, 372 N.E.2d 315 (1977). There is no allegation that any moving defendant had any direct communications with representatives of Mabon.

---

**3.** In addition to its purchases of IRCC securities, Mabon also purchased a $690,000 note from Michael's Art Metals in October 1986. However, that note was subsequently repaid, and accordingly cannot support a claim for relief.

*Conclusion*

For the foregoing reasons, the Court resolves these defendants' motion as follows:

The motion of defendant Robinson to dismiss the complaint as to him is granted.

The motion of the other moving defendants to dismiss the first claim insofar as it asserts primary liability under § 12(2) 1933 Act is granted. Insofar as the complaint asserts secondary liability under § 15 of the 1933 Act, the motion to dismiss is denied.

The motion to dismiss the second claim for violation of § 10(b) of the 1934 Act, Rule 10(b)–5 promulgated thereunder and § 20 of the 1934 Act is denied, although certain allegations of fraud will be stricken, consistent with this Opinion, in the absence of an amended pleading fully complying with Rule 9(b).

The motion to dismiss the third claim alleging violations of § 17(a) of the 1933 Act is granted without leave to replead.

The motion to dismiss the fourth claim is granted in respect of § 17(a) of the 1933 Act and denied in respect of § 10(b) of the 1934 Act.

The motion to dismiss the fifth claim alleging a RICO violation under 18 U.S.C. § 1962(b) is granted without leave to replead.

Decision on the motion to dismiss the sixth and seventh claims, charging violations of the RICO statute, 18 U.S.C. §§ 1962(c) and (d), is reserved pending further briefing consisting with this Opinion.

The motion to dismiss the eighth and ninth claims is denied, consistent with this Opinion.

The motion to dismiss the tenth claim is granted.

The parties are directed to file and serve additional briefs on the continuity issue raised by the Court in respect of the RICO claims. They are directed to exchange such briefs within thirty (30) days of the date of this Opinion, and to exchange reply briefs if so advised, fourteen (14) days thereafter.

Any repleading permitted by this Order shall be filed and served not later than forty-five (45) days of the date of this Order.

The case will be called for status conference on September 13, 1991 in Room 307 at 2:00 p.m. Counsel for all parties are directed to attend.

It is SO ORDERED.